

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-23-1995

# USA v Zehrbach

Precedential or Non-Precedential:

Docket 93-7477

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"USA v Zehrbach" (1995). *1995 Decisions.* Paper 20.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/20

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


Nos. 93-7477 and 93-7493


UNITED STATES OF AMERICA

v.

DARUS H. ZEHRBACH,

Appellant in No. 93-7477.

ALEX A. MERVIS,

Appellant in No. 93-7493.


Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Criminal Action No. 92-00218-01 and 02)


Argued October 28, 1993
Before:  ROTH, LEWIS and GARTH
Circuit Judges

Reargued in banc October 17, 1994
Before:  Sloviter, Chief Judge, Becker, Stapleton,
Mansmann, Greenberg, Hutchinson, Scirica, Cowen,
Nygaard, Alito, Lewis, Roth, McKee and Garth
Circuit Judges


(Opinion Filed January 23, 1995)




David M. Barasch
United States Attorney
Theodore B. Smith, III (Argued)
Assistant United States Attorney
Federal Building, 228 Walnut Street

P.O. Box 11754
Harrisburg, PA 17108
          Attorneys for Appellee


James V. Wade, Esquire
Federal Public Defender
Daniel I. Siegel, Esquire (Argued)
Assistant Public Defender
100 Chestnut Street, Suite 306
Harrisburg, PA 17101
          Attorneys for Appellant Zehrbach


Donald J. Goldberg, Esquire (Argued)
Creed C. Black, Jr., Esquire
Ballard, Spahr, Andrews & Ingersoll
1735 Market Street, 51st Floor
Philadelphia, PA 19103
          Attorneys for Appellant Mervis


OPINION OF THE COURT


ROTH, <u>Circuit</u> <u>Judge</u>:


        Defendants Darus Zehrbach and Alex Mervis appeal from jury verdicts convicting them each of two counts of bankruptcy fraud and one count of conspiracy to commit bankruptcy fraud, in violation of 18 U.S.C. § 152 (1988) and 18 U.S.C. § 371 (1988). In their appeals, Zehrbach and Mervis asserted two grounds for reversal. First, they argued that the district court erred in instructing the jury that the government need not prove, as an essential element of the crime, that they knew their actions to be illegal. Second, they asserted that comments made by the

prosecutor in his closing argument, regarding two of the defense witnesses, triggered a rule of per se reversal under United States v. DiLoreto, 888 F.2d 996 (3d Cir. 1990). Their appeals were first heard by a panel of this court. On the basis of the panel decision, Zehrbach and Mervis petitioned for rehearing in banc, which was granted as to both issues. For the reasons that follow, we will overrule our ruling in DiLoreto, insofar as it established a per se rule,[1] and we will affirm the convictions.

I.

In the late summer or fall of 1989, appellant, Darus Zehrbach, a West Virginia businessman doing business under the name of Consolidated Assets Management Corporation ("CAMCORP"), formulated a plan to purchase the assets of bankrupt aircraft manufacturing companies. Zehrbach became particularly interested in Taylorcraft Aviation Corporation ("Taylorcraft"), a company located in Lock Haven, Pennsylvania, that was in the process of a Chapter 7 liquidation proceeding.[2] Zehrbach retained the Pittsburgh investment banking firm, Drizos Investments, Inc., to facilitate the acquisition by locating other investors and securing financing.

---

[1] In overruling the per se rule announced in DiLoreto, we do not, based upon the facts presented in that case, in any way overrule the result reached by the DiLoreto court in reversing the convictions.

[2] Largely because of a failed $458,000 bid to purchase Taylorcraft at a prior bankruptcy auction, the Taylorcraft bankruptcy proceeding had been converted from a Chapter 11 debtor-in-possession proceeding into a Chapter 7 liquidation.

Appellant, Alex A. Mervis, a stock broker and a licensed pilot, had recently become an employee at Drizos Investments. Because of his aviation background, he was assigned to Zehrbach's project. Steven Drizos supervised Mervis's work on this assignment. Robert Smith of Capital Resources Group, a firm affiliated with Drizos Investments, was brought in to help with financing. Eventually, Mervis located John Polychron, a North Carolina investor, who agreed to become a limited partner in an association in which Zehrbach was to be the general partner.

The bankruptcy trustee for Taylorcraft was Charles Szybist, an attorney in Williamsport, Pennsylvania. Szybist contacted a number of potential bidders in an attempt to generate an offer that would be substantial enough to create a base for aggressive bidding. In September 1989, Szybist received a bid of $155,000 from Leander Research, Manufacturing and Distributing, Inc. ("Leander"). Using this as his base, Szybist notified creditors and other parties in interest of the offer, inviting higher bids to be submitted by October 23, 1989. The notice provided that Leander and all other higher, qualifying bidders would be permitted to participate at a final private auction to be held on October 30, 1989.

Three new parties, including Zehrbach through CAMCORP, entered bids. T. Chester Baker made a bid of $156,000; Starman Brothers Auctions bid $160,000; and CAMCORP bid $165,000. CAMCORP's bid had been agreed upon at a joint meeting between

Zehrbach, Polychron, Drizos, Smith, and Mervis. Because the names of the bidders were released, the Zehrbach group was in a position to contact the other bidders. Zehrbach instructed Mervis to negotiate a "buy-out" of their bidding positions. Baker, for reasons unrelated to the case, lost interest in the acquisition. The other parties remained serious. According to Mervis, he did not hesitate to follow Zehrbach's instructions because Zehrbach was a bankruptcy expert who "did this all of the time."

Steven Starman, of Starman Brothers Auctions, testified at trial that he would have bid up to "$200,000 plus" for Taylorcraft. Appendix ("App.") at 189. On October 25, Starman received a call from Mervis who asked what it would take to keep Starman out of the bidding process. Starman agreed to withdraw from the bidding for a payment of $40,000, with $10,000 to be paid up-front and the remainder by January 1990. A draft agreement was sent from Mervis's office at Drizos Investments to Starman for his signature and return. The document mischaracterized the nature of the payment as made "[i]n return for services renderd [sic]." Starman also received a form of notice that he was to sign, have notarized, and send to the bankruptcy judge, informing the bankruptcy court of his withdrawal from the bidding process. Upon receiving these documents, Starman consulted his attorney, David Buelt, a specialist in trusts and estates, who redrafted the agreement to

state that Starman Brothers Auctions was being paid to forgo its right to bid at the October 30 sale of Taylorcraft's assets. Steven Starman did not question Buelt about the legality of the agreement but merely expressed concerns about its enforceability. The parties executed the amended agreement, and, once Starman had received the initial $10,000 by wire transfer, he telephoned Szybist to inform him that he would no longer be participating in the bidding for Taylorcraft.

Leander Eckard, the president of Leander and the only other potential bidder, testified at trial that he would have been willing to bid up to approximately $250,000 for the purchase of Taylorcraft. App. at 179. Sometime shortly after the October 23 close of bidding, Mervis had contacted Eckard to discuss how much it would cost to purchase his bidding position. Although at first Eckard was not interested, he began to reconsider his position after he encountered difficulty in obtaining financing for the potential acquisition. Eckard's initial request was for a payment of $100,000, but Zehrbach instructed Mervis to negotiate a lower figure. On October 26, Eckard and Mervis agreed on a $50,000 fee with $30,000 payable immediately and the remainder covered by a promissory note and security in one of the Taylorcraft airplanes. Eckard had planned to fly from Seattle, Washington, to visit the Taylorcraft plant the next day, October 27, the last business day before the auction on October 30. He

agreed to meet Mervis at the Pittsburgh airport to finalize the bid buy-out.

To document the agreement with Eckard, Mervis contacted Charles Vollmer, a Pittsburgh attorney. Vollmer had worked with Drizos Investments in the past. Mervis and Vollmer met at 7:30 a.m. on October 27. Vollmer prepared three documents before departing for a 10:00 a.m. appointment. These documents were (1) a Letter of Intent for the limited partnership between Zehrbach and Polychron, which had not yet been formally created; (2) a letter to Polychron on Vollmer's firm letterhead with instructions on making the $30,000 wire transfer to Eckard; and (3) a bid buy-out agreement reflecting the terms of the negotiations between Mervis and Eckard. Like the revised agreement with Starman, the bid buy-out agreement stated that, in exchange for the payment, Leander "agree[d] to sell to TAC [Taylorcraft Acquisition Corporation, Zehrbach's group] all of its rights . . . [with regard to its bid for Taylorcraft] and, further, agree[d] not to participate either in its own right or through third parties in the bidding process."

At the time he drafted the documents, Vollmer knew very little about the transaction and had not conducted any legal research on the issues. After drafting the bid buy-out agreement, Vollmer expressed his uneasiness about the transaction to Mervis, stating that he "hoped this thing [was] legal."

During the afternoon of October 27, after Vollmer was able to consult two other attorneys and to do some legal research, he faxed a letter to Mervis and Smith explaining:

> Under the terms of the Agreement, Taylorcraft Acquisition Corporation would buy out Leander's "position" in the Bankruptcy Court. Prior to this morning, I had thought that the "position" that was being bought out, if indeed there was one being bought out, was that of a secured creditor. I simply remarked to Alex that, "I hope this [is] legal."

Mr. Vollmer then quoted, verbatim, the language of 18 U.S.C. § 152, the statute under which Zehrbach and Mervis were later charged. Vollmer's letter concluded:

> At this point, I must advise you that in my opinion, there is a possibility that this action violates these criminal provisions. Unless this matter is somehow reworked so that it is not a possible violation, such as a possible joint venture with Leander, I cannot recommend that you participate any further. Please advise.

App. at 61-62.

In the interim, after meeting with Vollmer, Mervis had gone to the airport to meet Eckard. Mervis gave Eckard the buy-out agreement, which Zehrbach had signed, and a $30,000 certified check. Mervis assured Eckard of the legality of the transaction, stating that his attorney had approved it. Eckard had already

called Szybist to inform him that he would not be coming to view the Taylorcraft plant or to place a bid.

Upon Mervis's return to his office that afternoon, he was informed of the Vollmer letter which questioned the legality of the bid buy-out scheme. Vollmer, Mervis, and Smith then held a conference call with Zehrbach to inform him of Vollmer's concerns. Zehrbach dismissed Vollmer's opinion, suggesting that Vollmer did not know what he was talking about. After Drizos and Smith requested a second legal opinion, Zehrbach contacted his West Virginia attorney, James D. Crane, who had bankruptcy experience. Crane affirmed the legality of the transaction, but he characterized it as a joint venture that had merged bidding interests. Crane was never informed that two bidders had been paid to withdraw their bids.

After both Starman and Leander withdrew from the bidding process just days before the auction was to occur, Szybist called Mervis and spoke of his concern that the other bidders "were having some difficulties." In response, Mervis suggested <u>not</u> that there had been payments to withdraw, but rather that "we had formed a joint venture and we had merged our bidding interest." Szybist decided to postpone the auction from October 30 to November 15 and to make it public rather than private. At the auction, the Zehrbach-Polychron group was the only bidder. Szybist accepted its bid of $165,000.

Shortly after the final sale, Szybist contacted the FBI about the circumstances surrounding the withdrawal of the Starman and Leander bids. After an FBI investigation, Mervis and Zehrbach were indicted, tried, and convicted of one count of conspiracy to commit bankruptcy fraud, in violation of 18 U.S.C. § 371,[3] and of two counts of bankruptcy fraud, pertaining to actions with regard to Starman and Eckard, in violation of 18 U.S.C. § 152.[4] Specifically, Zehrbach and Mervis were charged with conspiring to pay two bidders for the assets of Taylorcraft to refrain from bidding in a bankruptcy auction, with actually paying the bidders to refrain from bidding, and with purchasing the assets as the sole bidders.

---

[3] Section 371, conspiracy to commit offense or to defraud United States, provides in part:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

[4] Section 152, concealment of assets; false oaths and claims; bribery, provides in part:

> Whoever knowingly and fraudulently gives, offers, receives or attempts to obtain any money or property, remuneration, compensation, reward, advantage or promise thereof, for acting or forbearing to act in any case under title 11;
> . . .
> Shall be fined not more than $5,000 or imprisoned not more than five years, or both.

Because the defendants did not substantively contest the actions attributed to them, the sole issue at trial was that of intent. Mervis and Zehrbach defended themselves on the basis of their good faith belief that they had done nothing illegal. Zehrbach's position, as stated by his counsel, was that Zehrbach had made a mistake, just as the three attorneys involved in the transaction, Buelt, Vollmer, and Szybist, had made a similar mistake, and that Zehrbach could not have had fraudulent intent. Mervis testified that he was working on a joint venture to merge the bidding interests. Mervis also emphasized that Drizos and Smith had supervised his involvement in the project. Mervis's counsel argued that because Mervis was acting in good faith to form a joint venture, he had no intention to deceive. The government contended, on the other hand, that Zehrbach and Mervis knowingly paid the other bidders to withdraw from the auction, thereby keeping down the price paid for the Taylorcraft assets and, as a consequence, cheating the creditors of Taylorcraft and the bankruptcy trustee.

This question of good faith and knowledge of the law became an issue in the formulation of the jury charge. The district judge proposed first to list the essential elements of the substantive offense and to follow that with a detailed discussion of the requirements that the acts be performed "knowingly" and "fraudulently." He would then, as Zehrbach and Mervis requested, give an instruction on "good faith."

Although Zehrbach and Mervis fully concurred in the scope and content of the good faith instruction,[5] they challenged a portion of the "knowingly" instruction, in which the court stated that "[t]he government is not required to prove that a defendant knew that his acts were unlawful." When the district judge stated that he was going to leave this sentence in the instructions, counsel for Mervis requested, "May I have argument on that just to preserve my objection on the record?" App. at 608 (emphasis added). The district judge replied: "Sure. I know you objected to that." Id. Counsel for Zehrbach then argued that the instruction had "the potential of confusing the jury." Counsel suggested:

> By telling the jurors that the government is
> not required to prove that the defendant knew
> his acts were unlawful, the jurors may
> misconstrue that to mean that it is not
> relevant that the defendant did not know that
> his acts were unlawful.

Id. at 609. Counsel asked that the sentence be deleted "in the interest of clarity" because of the potential for confusion and "because the instructions clearly state[d] the burden of the government and [did] not state that [proof of knowledge of illegality] [was] one of the burdens of the government, because it [hadn't] been suggested that this is one of the burdens of the

---

[5] At a pre-charge conference, the district court asked each party for their response to the court's rewrite of the good faith instruction. Mervis' counsel said that it was "satisfactory," and Zehrbach's counsel found it to be "really much better than [the] original good faith defense instruction." App. at 601-02.

government and because it [would] not be suggested that is one of the burdens of the government . . .." Id.

The following excerpt from the jury charge, which fills twenty-six pages of trial transcript in its entirety, places the remark in context. Topic headings have been inserted for the ease of the reader. The instructions were as follows:

[1. The Elements]

In order to meet its burden of proof [on the bankruptcy counts] as to either defendant the government must establish beyond a reasonable doubt each one of the following elements: First, that the defendant gave or offered any money, property, remuneration, compensation, reward, advantage or promise of any of those things to another in exchange for that other person's acting or forbearing to act; second, that the action or forbearance, in exchange for which the money, property, advantage or promise thereof was given or offered, was in a case under Title 11 of the United States Code, the bankruptcy law; third, that the defendant gave or offered the money, property, advantage or promise thereof knowingly; and fourth, that the defendant did so fraudulently.

[2. "Knowingly"]

Now, in order to find a defendant guilty of bankruptcy fraud, therefore you must find beyond a reasonable doubt that the giving or offering of money, property, remuneration, compensation, reward, advantage or promise thereof was done knowingly. An act is done knowingly if it is done voluntarily and intentionally and not because of mistake or accident or other innocent reason. In other words, an act is done knowingly if the defendant is aware of the act and is not committing the act through ignorance, mistake, or accident. The government is not

<u>required to prove that a defendant knew that his acts were unlawful</u>.

It is also necessary . . . that you find beyond a reasonable doubt that the defendant knew that his acts were in connection with a bankruptcy proceeding.  You may consider evidence of a defendant's words, acts or omissions along with all other evidence in deciding whether a defendant acted knowingly.

[3.  "Fraudulently"]

Also, . . . you must . . . find beyond a reasonable doubt that the giving or offering of money, property, remuneration, compensation, reward, advantage or promise thereof was done fraudulently.  In a bankruptcy case, an act is done fraudulently if it is done with the intent to defraud the creditors of the bankrupt entity or with the intent to defraud the United States or the trustee in bankruptcy concerning their right and governmental function of regulating bankruptcies and fairly distributing the assets of the bankrupt entity.

Now, to act with fraudulent intent . . . means to act knowingly and with the specific intent to deceive, ordinarily for the purpose [of] either causing some financial loss to another or bringing about some financial gain to one's self [sic].

Now, intent ordinarily may not be proved directly because there is no way of fathoming or scrutinizing the operations of the human mind, but you may infer a defendant's intent from the surrounding circumstances.  You may consider any statements made and done or omitted by a defendant and all other facts and circumstances in evidence which indicate his state of mind.

To act with a fraudulent intent a person must act knowingly and with the intention or the purpose to deceive or to cheat, in this case either to deceive or to cheat the creditors of Taylorcraft Aviation Corporation or the bankruptcy trustee.

[Passage distinguishing intent and motive
omitted.]

[4.  "Good faith"]

Now, a defendant may contend that he did not act with the specific intent to commit the crimes with which he is charged since he acted in good faith.  A good faith is a complete defense to charges of acting with fraudulent intent because good faith is simply inconsistent with the intent to defraud.  A person acts with fraudulent intent and without good faith when he acts with a purpose to deceive or to cheat, and so as to deprive another person of a right or property.  While the term good faith has no precise definition, it means, among other things, an absence of an intention of taking advantage of another.

The burden of proving that a defendant did not act in good faith is on the government.  In determining whether a defendant acted in good faith you should consider all of the evidence in the case bearing on that defendant's state of mind.

If the evidence leaves you with a reasonable doubt as to whether a defendant acted with the intent to defraud, or in good faith, you must acquit him.  On the other hand, if you find that the government has proven beyond a reasonable doubt all of the other elements of the charged crimes and that a defendant did not act in good faith, then you should find that defendant guilty.

(Emphasis added).

At the conclusion of the reading of the jury charge, defense counsel renewed their objections to the instruction that the government was not required to prove that a defendant knew his acts were illegal.  App. at 726.

Zehrbach and Mervis also objected during closing argument to comments that the prosecutor made in regard to Drizos and Smith, whom the defense had called as witnesses to support Mervis's testimony that he believed he was creating a legal joint venture to acquire Taylorcraft. In his closing argument, the prosecutor suggested that neither Drizos nor Smith was "worthy of belief," citing testimony which cast doubt on their credibility. Specifically, the prosecutor pointed to Drizos's failure to inform Polychron that an attorney had advised Drizos to refrain from further action in connection with the buy-outs. He similarly noted Drizos's failure to ensure that his employee (Mervis) stop his involvement in potentially illegal activity. The prosecutor also cited the inconsistencies between what Smith had told the FBI and Smith's testimony in court. The prosecutor then commented:

> I suggest you shouldn't believe Drizos and Smith because they're guilty of exactly the same bankruptcy fraud that these two defendants are guilty of. And don't you assume that they are not going to get what's coming to them either.

Both defense counsel immediately objected to this statement. The district judge granted their motion to strike. He cautioned the jury to "disregard the last statement of the prosecutor with respect to what may or may not happen with respect to these two gentlemen." Moreover, the judge subsequently instructed the members of the jury to disregard

counsel's personal opinions and to make decisions based solely on the evidence.  He then reminded the jury not to consider any evidence that he had instructed them to disregard in the course of the proceedings.

Defense counsel later moved for a mistrial on the ground that the second comment was irrelevant and was based upon information outside the record.  The district court denied the motion, citing its curative instructions and questioning whether the statement "could have resulted . . . in any serious prejudice to either defendant."  Similarly, in denying Zehrbach's motion for a new trial, the district court held that the first sentence of the statement was properly based on evidence of the witnesses' own guilt that had been adduced at trial and that any improper inference that might have been induced by the second sentence had been cured by the court's instructions.  United States v. Zehrbach, No. 92-0218, mem. op. at 8-9 (M.D. Pa. Jul. 7, 1993).

Following the jury verdict, the district judge sentenced Zehrbach to a term of imprisonment of 21 months, followed by three years of supervised release, and sentenced Mervis to 10 months of imprisonment, followed by two years of supervised release.  Zehrbach and Mervis base their appeal on the two issues of the jury instructions and of the prosecutor's remarks in closing argument.

The district court had subject matter jurisdiction pursuant to 18 U.S.C. § 3231 (1988), and this court is vested with appellate jurisdiction pursuant to 28 U.S.C. § 1291 (1988).

## II.   THE JURY CHARGE.

### A.

Zehrbach and Mervis objected to the trial judge's instruction that "the government is not required to prove that a defendant knew that his acts were unlawful" on the grounds, expressed by counsel, that it had "the potential of confusing the jury." Defense counsel suggested that "[b]y telling the jurors that the government is not required to prove that the defendant knew his acts were unlawful, the jurors may misconstrue that to mean that it is not relevant that the defendant did not know his acts were unlawful." Although neither Zehrbach or Mervis's attorney proposed any clarifying language, they asked that the sentence be dropped "in the interest of clarity."

The extent of the grounds for defense counsels' objection to the challenged instruction are not entirely clear from the record. The objection could be construed as a challenge to the trial court's inclusion of the instruction as a matter of law. Alternatively, the objection could be read as a challenge merely to the confusing nature of the instruction. The basis of the objection determines the appropriate standard of review. We will consider the issue first as a review of the legal propriety

of the instructions.  In this light, if the objection is construed as a challenge to the court's statement of the legal standard, we exercise plenary review.  United States v. McGill, 964 F.2d 222, 235 (3d Cir. 1992); Savarese v. Agriss, 883 F.2d 1194, 1202 (3d Cir. 1989).  In connection with a review of the legal sufficiency of the instructions, however, if we were to determine that counsel had not objected at trial to the court's statement of the legal standard, we would review the legal propriety of the instructions on a "plain error" standard.[6] Whether we exercise plenary review or apply the plain error standard, however, we conclude that the court did not err in stating the relevant legal principles.

Zehrbach and Mervis concede that the jury charge correctly stated the government's burden of proof.  The jury instruction did not omit any of the four essential elements of bankruptcy fraud.  The trial judge properly instructed the jury that the government was required to establish beyond a reasonable doubt:

---

[6] Where a party has not made a clear, specific objection to the charge that he alleges is erroneous at trial, he waives the issue on appeal "unless the error was so fundamental and highly prejudicial as to constitute plain error."  Bennis v. Gable, 823 F.2d 723, 727 (3d Cir. 1987) (internal quotation omitted); see also United States v. Santos, 932 F.2d 244, 250-53 (3d Cir.) (examining the court's failure to define the burden of proof applicable to a duress defense for plain error where the party objected to the court's failure to give the defendant's proposed duress instruction), cert. denied 112 S. Ct. 592 (1991); United States v. Castro, 776 F.2d 1118, 1128-30 (3d Cir. 1985), cert. denied, 475 U.S. 1029 (1986).

First, that the defendant gave or offered any money, property, remuneration, compensation, reward, advantage or promise of any of those things to another in exchange for that other person's acting or forbearing to act; second, that the action or forbearance, in exchange for which the money, property, advantage or promise thereof was given or offered, was in a case under Title 11 of the United States Code, the bankruptcy law; third, that the defendant gave or offered the money, property, advantage or promise thereof knowingly; and fourth, that the defendant did so fraudulently.

App. at 716.

Zehrbach and Mervis do not argue that the elements of bankruptcy fraud were improperly set out. They contend, however, that the challenged instruction, contained in the court's further explanation of the element "knowingly," contradicted the court's good faith instruction. As set out infra, the trial judge had instructed the jury that good faith is a complete defense to bankruptcy fraud and that the government must prove that a defendant did not act in good faith. Zehrbach and Mervis made the good faith charge relevant by their claim that they were involved, not in an attempt to silence competing bidders, but merely in a joint venture with Starman and Leander to acquire Taylorcraft.

Our first consideration in reviewing defendants' argument is whether a good faith defense was necessary in view of the description of the elements of bankruptcy fraud which the district court gave to the jury. If the jury found beyond a

reasonable doubt that, by paying competitors not to bid in the auction, Zehrbach and Mervis acted with fraudulent intent to deceive or to cheat the creditors of Taylorcraft Aviation Corporation or the bankruptcy trustee, it would be inconsistent with this conclusion for the jury also to find that Zehrbach and Mervis had acted with good faith. When a jury has determined that an accused has intended to cheat his victim, the possibility that the accused also acted in good faith has been eliminated.

Because the trial judge had delivered detailed instructions regarding the elements of bankruptcy fraud, and in particular regarding the element of acting with fraudulent intent, the good faith instruction became in fact superfluous. The good faith instruction merely reiterated that the government carried the burden of demonstrating that the defendants did act with the requisite fraudulent intent.

Moreover, as Zehrbach and Mervis acknowledge, proof of knowledge of illegality is not a burden of the government in a bankruptcy fraud case. The statutory requirement that the underlying acts be performed "knowingly" requires only that the act be voluntary and intentional and not that a person knows that he is breaking the law. See Cheek v. United States, 498 U.S. 192, 199 (1991) (stating that as a general rule, the government is not required to prove the criminal defendant's knowledge of the illegality of his actions); United States v. Brown, 862 F.2d 1033, 1038 n.5 (3d Cir. 1988).

The instant case differs from those cases involving criminal offenses for which proof of knowledge of illegality is an element of the government's prima facie case.  In such cases, mistake of law is a complete defense.  For instance, the Supreme Court recently held that the "willfulness" element of the anti-structuring provision of the financial transaction reporting requirements, contained at 31 U.S.C. §§ 5322(a) & 5324, requires proof of knowledge of illegality.  See Ratzlaf v. United States, 114 S.Ct. 655, 658 (1994).  The Court based its holding upon a strict reading of the statutory language of the two sections.  Section 5324 provides that it is illegal to "structure" financial transactions "for the purpose of evading" a financial institution's reporting requirements.  Section 5322(a) establishes that "a person willfully violating" the anti-structuring provision (§ 5324) is subject to criminal penalties.  The Court found that failure to read knowledge of illegality into a violation prosecuted under § 5322 would -- in light of § 5324's purposefulness requirement -- treat "§ 5322(a)'s `willfulness' requirement essentially as surplusage."  Id. at 659-60.  In concluding, the Court stated that it did not "dishonor the venerable principle that ignorance of the law generally is no defense to a criminal charge" and emphasized that its decision was particular to the plain meaning of the statute then before it.[7]  Id. at 663.  See also Staples v. United States, 114 S.Ct.

---

[7] Since Ratzlaf was decided, Congress has amended § 5324 so that it contains its own criminal penalty provision, making

1793, 1804 (1994) (government required to prove defendant knew of the features of his semiautomatic firearm which brought it within the scope of the National Firearms Act, requiring registration of fully automtic weapons); United States v. Curran, 20 F.3d 560, 568-69 (3d Cir. 1994) (applying the Ratzlaf willfulness standard by analogy where the prosecution alleged a violation of the disclosure obligations imposed under the Election Campaign Act); United States v. Gross, 961 F.2d at 1102 (noting that belief in legality is a complete defense to the crime of making false statements to the Securities and Exchange Commission where the parties stipulated that the Government had the burden of showing that the defendant acted with knowledge of the wrongfulness of his actions).

We conclude, in light of the elements making up the offense of bankruptcy fraud, particularly the element of intent to defraud the creditors or the trustee of the bankruptcy estate, that a defendant's good faith belief in the lawfulness of his conduct is not a defense to bankruptcy fraud. In a case like the present one, where the defendants have claimed they were

(..continued)
resort to § 5322(a) unnecessary. The amended provision does not refer to a mental state but declares that "[w]hoever violates this section shall be fined in accordance with title 18, United States Code, imprisoned for not more than 5 years, or both." 1994 Riegle Community Development and Regulation Improvement Act, Pub. L. No. 103-325, § 411, 108 Stat. 2253 (1994). Because the provision no longer incorporates the willfulness requirement of § 5322(a), the only mental state that the Government must prove in prosecutions for structuring is the purpose of having a financial institution not file a required report.

attempting to set up a joint venture, a belief that acquisition of Taylorcraft through a joint venture was proper would be relevant for the jury to consider in determining if there was intent to defraud. However, the element of "knowledge of illegality" which is required in federal criminal tax offenses, see Cheek, 498 U.S. at 192, or in the violation of election disclosure obligations, see Curran, 20 F.3d at 569, is not a required element of bankruptcy fraud. Therefore, proof by a defendant of lack of knowledge of illegality cannot in and of itself defeat a conviction for bankruptcy fraud.[8]

In challenging the legal sufficiency of the charge on knowledge of illegality, Zehrbach and Mervis also argue that the inclusion of the statement unconstitutionally shifted the burden of proof or precluded the jury from considering proper exculpatory information. They rely primarily on two cases, United States v. Rhone, 864 F.2d 832 (D.C. Cir. 1989) and United States v. Schilleci, 545 F.2d 519 (5th Cir. 1977), both of which we find to be distinguishable.

---

[8] For this reason, we do not find error in the district court's ruling, if the court in fact did so rule, that defense counsel could not argue that good faith is a defense if there is a mistake as to the law, see App. at 607-08, so long as the element of intent to defraud had to be proved by the government beyond a reasonable doubt and so long as the jury could consider the defendant's state of mind in making its determination on intent to defraud. It is because we find that these latter two requirements were met in this case that we do not find such a ruling would have been erroneous.

In Rhone, the defendant appealed her conviction for mail fraud and theft arising out of her continued receipt of unemployment benefits after she had become employed full time. As in the instant case, the government had the burden of establishing specific intent to defraud, and the defendant's sole defense was that she lacked the requisite intent, i.e., that she didn't believe that her employment qualified as "full time" employment. At the close of the case, the trial court gave a standard jury instruction on specific intent to defraud but ended the instruction with the following statement: "And I should point out at this time that ignorance of the law is no excuse." United States v. Rhone, 864 F.2d at 834.

Suggesting that the quoted instruction eased the government's burden of proving specific intent beyond a reasonable doubt or at least "confused the jury on the very central issue of intent," the D.C. Circuit found that the statement created constitutional error requiring a new trial.

Id. at 836-37. The court concluded that

> [t]he jury . . . could well have inferred that the prosecution had met its burden of proving specific intent beyond a reasonable doubt simply on the basis that appellant was presumed to know the law and that she therefore knowingly committed fraud and theft.

Id. at 837.

We believe that the instruction in Rhone went far beyond the instruction given in this case. That instruction

effectively told the jury that ignorance of the law is irrelevant, suggesting -- incorrectly -- that the jury should not even consider the defendant's lack of knowledge of the law regarding her legal entitlement to unemployment benefits.  In the instant case, the court merely instructed the jury that the government was not required to prove that the defendants knew their actions to be illegal.  This instruction correctly stated the government's burden of proof in this case and in addition was made pursuant to a charge in which the district court instructed the jury no less that three times, once each in connection with the defense of "good faith" and the elements of "knowingly" and "fraudulently," that they "should consider all of the evidence in the case bearing on that defendant's state of mind."

Schilleci involved the appeal of a conviction for conspiring to intercept wire and oral communications, in violation of 18 U.S.C. § 2511.  This offense is a crime of specific intent and has been held to require an intentional or reckless disregard of legal obligations.  See Malouche v. JH Management Co., Inc., 839 F.2d 1024, 1025 (4th Cir. 1988) (§2511 was intended "to denote at least a voluntary, intentional violation of, and perhaps also a reckless disregard of, a known legal duty", citing Citron v. Citron, 722 F.2d 14, 16 (2d Cir. 1983) cert. denied, 466 U.S. 973 (1984)).  For this reason we do not find that the Fifth Circuit's reasoning in Schilleci is helpful to our consideration of an offense, like bankruptcy

fraud, where the government must prove intent to cheat or defraud but where there is not a duty for the government to prove that the defendant knew his acts were illegal.

Contrary to the arguments of Zehrbach and Mervis, we find that the charge in the instant case fairly and adequately submitted the issues to the jury for determination. The charge accurately stated the government's burden of proof. It did not preclude consideration of defendants' claim that they thought they were putting together a joint venture and that they did not know that what they were doing was illegal. Importantly, the challenged instruction did not shift the government's burden of proving fraudulent intent. At the same time, however, it did not preclude the jury from considering exculpatory information which Zehrbach and Mervis introduced in an effort to establish their defense. Rather, the instruction merely explained that proof of knowledge of illegality was not a burden of the government's case in chief. We conclude that the court did not err as a matter of law in setting forth the legal standards governing the jury's consideration.

Moreover, since we have found that the legal standard of the charge survived plenary review on the supposition that a proper objection was made to the jury instructions, if we should instead determine that defense counsel failed to object to the legal propriety of the inclusion of the "the government is not required to prove that a defendant knew that his acts were

unlawful" language in the jury instructions, clearly the giving

of this charge does not constitute plain error.[9]

B.

Whether or not defense counsel preserved an objection

to the legal sufficiency of the charge, counsel clearly objected

to the charge on the ground that it was potentially confusing to

the jury.  In reviewing jury instructions, we review the trial

court's expression for abuse of discretion.  Savarese v. Agriss,

883 F.2d at 1194; United States v. Messerlian, 832 F.2d 778, 789

(3d Cir. 1987), cert. denied, 485 U.S. 988 (1988).  We must

consider "whether, viewed in light of the evidence, the charge as

a whole fairly and adequately submits the issues in the case to

the jury."  Bennis v. Gable, 823 F.2d at 727.  We must reverse if

"the instruction was capable of confusing and thereby misleading

the jury."  Bennis v. Gable, 823 F.2d at 727 (citing United

States v. Fischbach and Moore, Inc., 750 F.2d 1183 (1984));

United States v. Goldblatt, 813 F.2d 619, 623 (3d Cir. 1987).

Examining the jury charge as a whole, we cannot agree

with Zehrbach and Mervis that the challenged instruction was

capable of confusing the jury, even in relation to the good faith

instruction.  Notably, the good faith instruction came after the

---

[9] This court has defined "plain error" as "those errors that
seriously affect the fairness, integrity or public reputation of
judicial proceedings." United States v. Santos, 932 F.2d at 250
(internal quotation omitted).  The doctrine is applied
"`sparingly' . . . and only where the error was sure to have had
an `unfair prejudicial impact on the jury's deliberations.'" Id.
(citation omitted).

instructions on "knowingly" and "fraudulently," serving as a general statement on the absence or existence of the required intent. The court explained that good faith is an absolute defense, that "all evidence bearing on [the] defendant's state of mind" should be considered, and that the jury must acquit if they had a reasonable doubt about the existence of intent or good faith. Given this language, it is unlikely that the jury mistakenly did not consider Mervis and Zehrbach's alleged belief in the legality of their actions when the jury was deliberating on the question of whether the government had proved fraudulent intent beyond a reasonable doubt.

As a more general matter, the court continuously reinforced the notions that the burden of proof in a criminal case is always upon the government; that the defendants are protected by a presumption of innocence; and that, unless they are proven guilty beyond a reasonable doubt, the defendants must be acquitted. The court repeated these principles at least six times during the course of its final instructions to the jury. In addition, the court instructed the jury to "consider the charge as a whole," rather than "singl[ing] out any one instruction." This reinforces our belief that the jury would not have been misled by the single instruction that the government need not prove knowledge of illegality.

Moreover, when defense counsel first challenged the instruction, the court explained that it felt that the

instruction was necessary in order to clarify precisely what "knowledge" is required of a defendant who acts "knowingly" in the commission of bankruptcy fraud. That decision was clearly committed to the discretion of the district court. Here, Zehrbach and Mervis did not challenge the content of the good faith instruction, nor did they propose the inclusion of a sentence clarifying the relationship between their claimed ignorance of the law and their good faith defense. They simply challenged the inclusion of language which in fact correctly commented on an element that the government did not need to prove. Therefore, because we believe that the jury charge, taken as a whole, was not misleading or confusing to the jury, we find no abuse of discretion.

### III.  THE PROSECUTOR'S REMARKS.

#### A.

We turn next to Zehrbach and Mervis' argument that the prosecutor prejudiced their right to a fair trial when he stated in his closing argument:

> I suggest you shouldn't believe Drizos and Smith because they're guilty of exactly the same bankruptcy fraud that these two defendants are guilty of. And don't you assume that they are not going to get what's coming to them either.

Zehrbach and Mervis urge that these remarks comment on the credibility of Drizos and Smith, based on facts not in the record, and are therefore per se grounds for a new trial under

DiLoreto, 888 F.2d at 996.  For the reasons stated below, we will overrule the per se rule of DiLoreto.  Rather than using the DiLoreto per se rule, we will analyze this case on its own facts. In making this analysis, because we must conclude that the prosecutor's remarks were improper, we will go on to weigh the remarks under a harmless error standard.  See United States v. Young, 470 U.S. 1, 11-12 (1985).

                                B.

        Prosecutorial misconduct does not always warrant the granting of a mistrial.  The Supreme Court has acknowledged that given "the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and that the Constitution does not guarantee such a trial."  United States v. Hasting, 461 U.S. 499, 508-09 (1983).  Thus, the Supreme Court has held that an appellate court should not exercise its "[s]upervisory power to reverse a conviction . . . when the error to which it is addressed is harmless since, by definition, the conviction would have been obtained notwithstanding the asserted error."  Id. at 506.

        The harmless error doctrine requires that the court consider an error in light of the record as a whole, but the standard of review in determining whether an error is harmless depends on whether the error was constitutional or non-constitutional.  In this instance, the alleged error, attacking the credibility of a witness with evidence not in the record, is

non-constitutional.  We have held that non-constitutional error is harmless when "it is highly probable that the error did not contribute to the judgment."  Government of Virgin Islands v. Toto, 529 F.2d 278, 284 (3d Cir. 1976).  "High probability" requires that the court possess a "sure conviction that the error did not prejudice" the defendant.  United States v. Jannotti, 729 F.2d 213, 219-20 (3d Cir.), cert. denied, 469 U.S. 880 (1984).  Therefore, we will reverse if we conclude that the prosecutor's remarks, taken in the context of the trial as a whole, prejudiced the defendants.

In determining prejudice, we consider the scope of the objectionable comments and their relationship to the entire proceeding, the ameliorative effect of any curative instructions given, and the strength of the evidence supporting the defendant's conviction.[10]  As the Supreme Court has emphasized "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context."  United States v. Young, 470 U.S. at 11 (finding harmless error where the prosecutor had stated his opinion that the defendant was guilty and urged the jury to "do its job").

---

[10]    See United States v. Gambino, 926 F.2d at 1355, 1365 (3d Cir.), cert. denied sub nom. Mannino v. United States, 501 U.S. 1206 (1991); United States v. DiPasquale, 740 F.2d 1282 (3d Cir. 1984), cert. denied, 469 U.S. 1228 (1985); United States v. Homer, 545 F.2d 864, 867-68 (3d Cir. 1976), cert. denied, 431 U.S. 954 (1977).

C.

The first sentence of the prosecutor's objectionable remarks suggested that the jury should not believe Drizos and Smith because they were also guilty of the crimes of which the defendants were guilty. This statement was clearly improper to the extent that it reflected the prosecutor's opinion concerning the guilt of Mervis and Zehrbach. As the Supreme Court has held, when a prosecutor expresses his personal opinion concerning the guilt of the accused, he creates two risks:

> such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.

United States v. Young, 470 U.S. at 18–19.

In addition, the statement was improper as an expression of the prosecutor's personal belief regarding the guilt of the two witnesses themselves.[11] As the district court

---

[11] Although counsel may state his views of what the evidence shows and the inferences and conclusions that the evidence supports, it is clearly improper to introduce information based on personal belief or knowledge. Standard 3-5.8(b) of the American Bar Association Standards for Criminal Justice provides:

> It is unprofessional conduct for the prosecutor to express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.

See also ABA Model Rules of Professional Conduct, Rule 3.4(e)(stating that a lawyer shall not "in trial . . . assert

held, however, "[i]t is not impermissible to argue the conclusion that witnesses other than the accused are guilty of a crime when evidence of such has been produced." United States v. Zehrbach, No. 92-0218, mem. op. at 8. Evidence regarding Drizos and Smith's decision making and supervision of the bid buy-out scheme, including testimony by both witnesses as to their active participation, supported the prosecutor's challenged remark, prompting the district court to conclude that the remark was "based on evidence adduced at trial." Id. Nonetheless, to the extent that the sentence was an expression of the prosecutor's personal belief, it was inappropriate and is subject to review for prejudicial effect, as is the second sentence of the prosecutor's remarks.

The second sentence, which entreated the jury not to assume that Drizos and Smith were "not going to get what's coming to them," was improper and irrelevant, because it referred to information outside of the record and sought to influence the decision of the jury on an illegitimate basis. This Court has long acknowledged a defendant's "right to have his guilt or innocence determined by the evidence presented against him, not by what has happened" -- or by what may happen -- "with regard to a criminal prosecution against someone else." United States v.

(..continued)
personal knowledge of facts in issue except when testifying as a witness, or state a personal opinion as to the justness of a cause, the credibility of a witness, . . . or the guilt or innocence of an accused").

<u>Thomas</u>, 998 F.2d 1202, 1207 (3d Cir. 1993) (quoting <u>United States v. Toner</u>, 173 F.2d 140, 142 (3d Cir. 1949)).[12]

As the district court concluded in denying Zehrbach's motion for a new trial, the prosecutor may have made the remark "to keep the jury from reaching a verdict on an improper basis, i.e. that all of the guilty parties had not been brought to justice, and only the defendants then on trial had been singled out for prosecution." <u>United States v. Zehrbach</u>, No. 92-0218, mem. op. at 8-9. The court's conclusion was consistent with the grounds that counsel for Zehrbach originally stated to support his motion for a mistrial. Nonetheless, the remark effectively encouraged the jury to reach a guilty verdict on irrelevant and illegitimate grounds.

Furthermore, given that the prosecutor made the statement in question immediately after telling the jury that the witnesses should not be believed because they were themselves guilty, the comment could also be construed as a comment on the witnesses' credibility. Thus, Zehrbach and Mervis argued that

---

[12] Likewise, standard 3-5.8(d) of the American Bar Association Standards for Criminal Justice explains:
> The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law . . . .

Standard 3-5.9 further advises:
> It is unprofessional conduct for the prosecutor intentionally to refer to or argue on the basis of facts outside the record.

this court's holding in United States v. DiLoreto, 888 F.2d at 996, required reversal per se.

In DiLoreto, the defendants objected to the prosecutor's comments in closing argument regarding the credibility of the defendants' accomplices, who testified for the Government after entering into plea agreements themselves. The prosecutor stated: "We don't take liars. We don't put liars on the stand. We don't do that." DiLoreto, 888 F.2d at 998. Although the defendants characterized the comments as "improper prosecutorial vouching depriving them of a fair trial," the district court denied both their motions for mistrial and their subsequent request for curative instruction. On appeal, this court vacated and remanded, holding that "a prosecutor's remarks regarding the defendant's guilt or a witness' credibility, if based on information not adduced at trial, require reversal per se." Id. at 999.

The per se reversal standard announced in DiLoreto, however, conflicts with Supreme Court case law requiring the court to analyze prosecutorial comments case by case, in the context of the entire trial, and to reverse only where the defendant has suffered prejudice. United States v. Young, 470 U.S. at 111-12. Therefore, we expressly overrule DiLoreto insofar as it established a per se, rather than a case by case, rule. We will, therefore, analyze the prosecutor's remark pursuant to the harmless error doctrine. In light of that

analysis, we conclude that both comments, though truly improper and unfortunate, do not constitute reversible error.

D.

Although it is true that irreparable harm may be inflicted in a moment, the comments at issue were but two sentences in a closing argument that filled forty pages of transcript. Immediately after the objection, the court gave a specific instruction to disregard the prosecutor's comment, an instruction that the court repeated just a short time later at the close of the prosecutor's argument. As a general matter, the court told the jurors to disregard any personal opinion of counsel and to base their decision solely on the evidence. And, in its final instructions, the court cautioned the jury members that the arguments of counsel are not evidence; that they must not be persuaded by bias, prejudice, or sympathy; and that they must not consider any evidence that they were earlier instructed to disregard. We believe that this extensive cautioning by the court was sufficient to cure the prosecutor's error.

Furthermore, the extensive evidence of Zehrbach and Mervis's intent to defraud supports our conclusion that the prosecutor's remarks would not have prejudiced the jury's deliberations. The evidence clearly supports the government's burden of proving that Zehrbach and Mervis knowingly and fraudulently paid other bidders to refrain from bidding for assets in a bankruptcy auction.

Zehrbach and Mervis acted in blatant disregard of questions about the legality of their actions, and they repeatedly mischaracterized the transaction. In response to Polychron's inquiry as to whether the buy-outs were "kosher," Mervis promised to obtain an opinion letter from an attorney approving the transaction. Mervis failed to produce such a letter. Moreover, when Attorney Vollmer sent an unsolicited letter quoting the relevant criminal statute and strongly advising against further participation in the bid buy-out scheme, Mervis and Zehrbach chose to disregard it. Zehrbach made some effort to obtain another opinion, from Attorney Crane, to assuage concerns. But Crane's positive opinion affirming the legality of "the transaction" rested on a misrepresentation of the transaction as a joint-venture rather than a bid buy-out. In fact, in seeking Crane's legal opinion, no one had mentioned to him the payments made to Starman and Eckard to refrain from bidding. Mervis was similarly selective in his discussions with the bankruptcy trustee and the FBI, referring to the transaction as a "merger of interests" or a "joint-venture" and remaining silent about the payments.

We find the evidence of knowledge and of deception to be substantial. Under these circumstances and given the court's curative instructions, we find that the remarks of the prosecutor constitute harmless error.

                                IV.

        For the foregoing reasons, we will affirm the judgments

of conviction of the district court.


United States v. Darus H. Zehrbach

United States v. Alex A. Mervis

Nos. 93-7477 and 93-7493



LEWIS, Circuit Judge, dissenting.

        I join in Parts I and II of the majority opinion, and

in Part III insofar as it overrules the per se rule of DiLoreto.

However, I cannot join in Part III of the opinion to the extent

it concludes that the error here was harmless.

        It is difficult for me to imagine a statement which

would carry a more powerful impact upon a jury, or which would be

more likely to deter it from acquitting, than to imply in no

uncertain terms that the defendants' two chief witnesses were

going to be indicted for their participation with the defendants

in the underlying criminal activity.  That is exactly what

happened here.  The prosecutor's statement was tantamount to

telling the jury that the defendants' two main witnesses were in

fact as guilty as the defendants were and would themselves be

brought to answer criminal charges, despite the fact that there

was no evidence to suggest that these individuals were going to be indicted and despite the more compelling fact that they never were indicted.

The majority acknowledges that "the remark effectively encouraged the jury to reach a guilty verdict on irrelevant and illegitimate grounds."  Maj. Op. Typescript at 34.  How, then, can we be confident that "it is highly probable that the error did not contribute to the judgment"?  See Maj. Op. Typescript at 31, citing Govt. of Virgin Islands v. Toto, 529 F.2d 278, 274 (3d Cir. 1976).  "Highly probable" requires us to be virtually certain, as that standard is only satisfied when we hold a "sure conviction that the error did not prejudice" the defendant.  See Maj. Op. Typescript at 31, citing United States v. Jannotti, 729 F.2d 213, 219-20 (3d Cir.), cert. denied 469 U.S. 880 (1984). The majority acknowledges this also, but then shifts its focus from the impact of the remarks to the prosecutor's motive in uttering them.  I believe this diversion to be the fundamental flaw in the majority's analysis.  Since we must be convinced that a criminal defendant was not prejudiced for harmless error to apply, what difference does it make to that inquiry that the prosecutor might have meant something else in uttering the offending remarks?  It is not what the prosecutor meant that should control, but rather the effect of what he said upon the defendants' right to be judged by an untainted jury.  Our focus should be to determine that it is almost certain that the error

did not contribute to the conviction.  In my view, the majority does not place sufficient emphasis upon this critical inquiry.

And it is precisely for this reason that I believe the majority fails to perceive the violence which remarks such as those at issue are capable of inflicting upon the unfettered fact-finding and truth-seeking mission of the jury, preferring instead to rely upon the court's cautionary instructions and the quantum of evidence properly before the jury which pointed toward guilt.  As I stated in my original dissent, "I cannot imagine any curative instruction that would be sufficient to purge the jury of the powerful impact of such an improper, unfounded assertion by the prosecutor."  United States v. Zehrbach, Nos. 93-7477 and 93-7493 at 8 (Lewis, J. dissenting).  I believe this is particularly true in view of the fact that to a considerable degree, the defendants' convictions rested upon the jury's assessment of the credibility of Drizos and Smith.  Moreover, I am not persuaded that the jury could not have been influenced by these improper remarks, to the prejudice of the defendants, regardless of the weight of additional evidence demonstrating their guilt.

For these reasons, I respectfully dissent.