**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-3060
_____

UNITED STATES OF AMERICA

v.

OMELYAN BOTSVYNYUK,

A/K/A MILO,

Appellant
_____

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(Crim. No. 2-10-cr-00159-001)
District Judge: Honorable Paul S. Diamond
_____

No. 12-3088
_____

UNITED STATES OF AMERICA

v.

STEPAN BOTSVYNYUK,

A/K/A STOYPA,

Appellant
_____

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(Crim. No. 2-10-cr-00159-002)
District Judge: Honorable Paul S. Diamond

Before: CHAGARES, VANASKIE, and SHWARTZ, <u>Circuit</u> <u>Judges</u>

(Filed: January 13, 2014)

_____

OPINION

_____

VANASKIE, *Circuit Judge.*

In these consolidated appeals, Appellants and brothers Omelyan Botsvynyuk
(hereinafter, "Omelyan") and Stepan Botsvynyuk (hereinafter, "Stepan") challenge their
convictions for conspiracy to participate in a racketeering enterprise, in violation of the
Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d).  Omelyan
also appeals his conviction for conspiracy to interfere with interstate commerce by
extortion, in violation of the Hobbs Act, 18 U.S.C. § 1951, as well as his sentence.   For
the reasons that follow, we will affirm.

I.

A.

On March 17, 2010, a federal grand jury sitting in the Eastern District of
Pennsylvania returned an indictment against Omelyan, Stepan and three of their
brothers.[1]  Count One charged the Botsvynyuk brothers with conspiracy to conduct a

_____

[1]    The record indicates that two of the brothers, Yarsolav Churuk and Mykhaylo
Botsvynyuk, were arrested in Canada and are awaiting extradition to the United States.
Dmytro Botsvynyuk resides in Ukraine, which does not have an extradition treaty with
the United States.

racketeering enterprise in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d).  Counts Two and Three charged Omelyan with extortion in violation of the Hobbs Act, 18 U.S.C. § 1951, and Count Four charged Stepan with extortion in violation of the same statute.

Omelyan and Stepan were tried by a jury beginning September 13, 2011.  On October 12, 2011, the jury found Omelyan guilty of RICO conspiracy and Hobbs Act extortion (Counts One and Two),[2] and Stepan guilty of RICO conspiracy (Count One), but not guilty of Hobbs Act extortion (Count Four).

Approximately eight months after the jury reached its verdict, Omelyan filed, and the District Court denied, a Motion for Judgment of Acquittal and a Motion for New Trial.  He argued that the charges against him were time-barred because the only crimes alleged to have occurred within the limitations period were extortionate acts that occurred in Ukraine between 2005 and 2007, and that such extraterritorial conduct was outside the purview of the United States courts.  Unlike Omelyan, Stepan did not file any post-conviction motions.

On July 16, 2012, the District Court, in a thorough and well-reasoned opinion, denied Omelyan's post-trial motions, finding that the statute of limitations argument was both waived and meritless.  On the same date, the District Court sentenced Omelyan to a term of life imprisonment on the RICO conviction and a consecutive term of 240 months'

---

[2]        During trial the government withdrew Count Three.

3

imprisonment for extortion. The next day, Stepan was sentenced to 240 months' imprisonment on the RICO conviction. These appeals followed.

B.

Between January 2001 and late 2003, the Botsvynyuk Organization (the "Organization"), a Philadelphia-based criminal enterprise, smuggled destitute Ukrainian citizens into the United States and forced them to work for little to no pay. Omelyan was the leader of the Organization, which also consisted of Stepan, the three other Botsvynyuk brothers named in the indictment, and associates in Poland, Ukraine, Mexico, and the United States. The Organization lured victims to the United States by promising them $300 to $500 per month – a small fortune compared to the $20 to $50 monthly income some of the victims testified to earning in Ukraine. The victims were further enticed to move to the United States by the promise that the Organization would pay their travel expenses, as well as their food and housing costs after they arrived in the United States. In total, the Organization induced at least 60, and as many as 70, Ukrainian citizens to move to the United States.

Victims were smuggled into the United States through Mexico. Once the victims crossed the border, Organization associates helped facilitate their travel to Philadelphia. Upon arriving in Philadelphia, the victims were immediately forced to clean retail stores, private homes, and office buildings in Pennsylvania, Maryland, New York, and Washington, D.C. Each Botsvynyuk brother housed and controlled a different group of victims, referred to as his "crew." The victims were forced to live in deplorable

4

conditions. One victim reported that Omelyan became angry when members of his crew ate, and that he gave them food he kept for his own consumption only after it had spoiled.

The victims worked six to seven days per week, often for more than sixteen hours per day. Payment for their labor went directly to the Organization. The Botsvynyuk brothers told the victims that they would not be compensated or released until they satisfied "debts" they owed the Organization for their travel to the United States. The alleged debts typically totaled $10,000 to $15,000.

In addition to debt bondage, the Organization used violence and threats of violence to compel the victims' labor and ensure that they would remain captive. The victims feared they would be arrested if they escaped because the Organization confiscated all of their identification, travel documents, and immigration papers. Fear for their families' safety served as an equally effective deterrent to escape. The Organization constantly warned the victims that if they escaped before satisfying their debts, their families in Ukraine would be harmed, forced to work off their debts, or even killed. When one victim escaped in 2001, he returned to servitude because his sister in Ukraine informed him that their brother had been arrested and jailed at the direction of the Organization. Other victims were warned that if they escaped, their families in Ukraine would suffer similar or worse consequences.

All the victims did manage to escape eventually. But escape by one victim came at a price to those who had remained captive. When one victim would escape, the others would be beaten or threatened. In addition, members of escaped victims' families who

lived in Ukraine were threatened in an effort to determine the location of an escapee and/or to collect money. While all the victims escaped by 2003, the threats to family members in Ukraine continued to be made up until 2007. In 2005 and 2007, Omelyan traveled to Ukraine and delivered his threats in person. These threats were meant to carry out the Organization's main goal, which was to force the victims into providing the Organization with money and uncompensated labor. Consistent with Omelyan's intentions, the victims' family members conveyed the threats to the victims still hiding in the United States.

## II.

On appeal, Omelyan challenges the District Court's jurisdiction, the jury instructions, and his sentence. In addition, Omelyan, as well as Stepan, argue that their trial attorneys were ineffective for failing to raise the affirmative defense of the statute of limitations. We will address each argument in turn.[3]

## A.

As an initial matter, we note that the District Court properly found that the statute of limitations defense had been waived. The Bostvynyuks waived the defense because Omelyan raised it for the first time eight months after trial, and Stepan raises it, albeit indirectly, for the first time on appeal. *See United States v. Ciavarella*, 716 F.3d 705, 733 (3d Cir. 2013).

---

[3]    The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. We have appellate jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

6

Omelyan seeks to evade his waiver by contending that the District Court lacked jurisdiction over the criminal conduct occurring within the limitations period because such conduct took place outside the United States. We are unpersuaded by Omelyan's effort to avoid the fact that the limitations defense was waived. The law in this Circuit is that "in criminal cases the statute of limitations does not go to the jurisdiction of the court but is an affirmative defense that will be considered waived if not raised in the district court before or at trial." *United States v. Karlin*, 785 F.2d 90, 92-93 (3d Cir. 1986). Furthermore, Omelyan's arguments pertaining to the fact that the acts of extortion that occurred within five years of the indictment occurred outside the United States does not go the question of whether the District Court had subject matter jurisdiction, but instead "is a merits question." *Morrison v. Nat'l Austl. Bank Ltd.,* 561 U.S. 247, 130 S.Ct. 2869, 2877 (2010). Accordingly, having failed to preserve the statute of limitations defense, Omelyan cannot avoid waiver by dressing this defense in jurisdictional garb.

Omelyan, as well as Stepan, attempt to avoid the waiver of the statute of limitations defense by asserting that trial counsel was ineffective for failing to pursue it and for not requesting jury instructions on the issue. We, however, generally do not review ineffective assistance of counsel claims on direct appeal, *see United States v. Thornton*, 327 F.3d 268, 271-72 (3d Cir. 2003), and will not entertain the ineffectiveness of counsel challenge now. *See Massaro v. United States*, 538 U.S. 500, 504-05 (2003) ("[I]n most cases a motion brought under § 2255 is preferable to direct appeal for

7

deciding claims of ineffective assistance."). Omelyan and Stepan may instead pursue such a claim under 28 U.S.C. § 2255. *See Thornton,* 327 F.3d at 272.

B.

Next, we turn to Omelyan's contention that the District Court erroneously instructed the jury with respect to the racketeering activities that could support a RICO conspiracy conviction. Because Omelyan did not object below, we review the District Court's instructions to the jury for plain error. *See United States v. Thayer*, 201 F.3d 214, 221-22 (3d Cir. 1999). In the context of a challenge to jury instructions, plain error requires a finding that, taken as a whole, the instructions "had a prejudicial impact on the jury's deliberations" to the extent that the instructions "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." *United States v. Xavier*, 2 F.3d 1281, 1287 (3d Cir. 1993) (internal citations and quotations omitted). We find no such error here.

Omelyan argues that the District Court "erroneously instructed the jury as to at least seven [] different acts of racketeering activity that would constitute a violation of [RICO conspiracy], when the Indictment only charged a violation of four [] federal statutes." Omelyan's Br. at 42. His argument misstates the District Court's jury instructions, which clearly and accurately described the racketeering activities charged in the indictment.

Count One charged Omelyan and his brothers with conspiring to participate in the affairs of a criminal enterprise through a pattern of racketeering activity "consisting of

8

multiple acts indictable under" four federal statutes. (Omelyan App. 83). The District Court instructed the jury that, in order to find the Bostvynyuks guilty of RICO conspiracy, it must find that they conspired to commit at least two of the racketeering activities charged in the indictment.

The Court began its instructions with respect to the racketeering activities by explaining the elements of the first three activities charged in the indictment – peonage, involuntary servitude, and extortion. The District Court then moved to the fourth charged racketeering activity, "bringing in, transporting, and harboring illegal aliens for purposes of financial gain," 8 U.S.C. § 1324, which an individual can violate by: (1) "encouraging and inducing illegal entry of an alien;" (2) "bringing illegal aliens to the United States in a place other than a designated port of entry;" (3) "transporting illegal aliens;" *or* (4) "harboring illegal aliens." (Omelyan App. 159-161). Because the indictment necessarily included all four means of violating the statute, the District Court properly instructed the jury that any one of the four types of violations enumerated in 8 U.S.C. § 1324 could constitute a predicate act of racketeering. And the District Court correctly instructed the jury that it could find the Bostvynyuks guilty of RICO conspiracy based on any combination of the charged offenses – involuntary servitude, peonage, extortion, and the four types of violations of 8 U.S.C. § 1324 discussed above.

Omelyan further asserts that that the District Court erroneously instructed the jury that it could consider aggravated sexual assault as a racketeering activity, and not merely as a sentencing enhancement. We disagree. After identifying the elements of the

9

racketeering activities charged in the indictment, the District Court instructed the jury that "[t]he indictment also alleges that Omelyan Botsvynyuk knowingly held [victim M.S.1] in involuntary servitude and in a condition of peonage, by means of aggravated sexual abuse and rape against her in furtherance of the RICO conspiracy." (Omelyan App. 171-172).

When presenting the verdict sheet to the jury, the Court explained that jurors were only to answer interrogatories regarding aggravated sexual assault if the jury "unanimously and beyond a reasonable doubt" found that Omelyan committed peonage or involuntary servitude. (Omelyan App. 198-199). The District Court's explanation of the verdict sheet, and the verdict sheet itself, drew a clear distinction between the predicate acts of racketeering and aggravated sexual assault in furtherance of those acts. We therefore find that the District Court's charge as a whole fairly and adequately submitted the issue of aggravated sexual assault as a sentencing factor to the jury.

## C.

Omelyan contends that he was illegally sentenced to life imprisonment based on an erroneous enhancement for aggravated sexual assault under 18 U.S.C. §§ 1581 (peonage) and 1584 (involuntary servitude). He cites to no authority to support his argument, which is contrary to the text of the relevant statutes. Both Section 1581 and Section 1584 provide that if a defendant subjects another to involuntary servitude or peonage, and the "violation includes . . . aggravated sexual abuse . . . the defendant shall be fined . . . or imprisoned for any term of years or life, or both." The jury expressly

10

found that Omelyan committed aggravated sexual assault during the commission of the crimes of involuntary servitude and peonage. Therefore, the District Court did not err in sentencing him to the statutory maximum sentence of life imprisonment.

Omelyan argues that the District Court improperly applied U.S.S.G. § 2A3.1(a)(2) for the offense conduct involving the rape of M.S.1 and asserts that adding four points to the offense level for conduct described in 18 U.S.C. § 2241 was improper because he was not convicted of an offense under that statute. These arguments lack merit.

As Omelyan concedes, U.S.S.G.§ 2H1.4 applies to calculating his offense level for this conduct. Section 2H1.4 directs that if another felony offense was committed during the commission of peonage or involuntary servitude, then the offense level is 2 plus the offense level from the guideline applicable to the other offense. Here, the jury found that Omelyan committed an aggravated sexual assault during the course of the offenses of involuntary servitude and peonage. Although he was not charged and the jury did not find that he violated Section 2241, "there is no statutory or constitutional requirement that a defendant be convicted of conduct before the conduct may be considered in sentencing." *United States v. Pollard*, 986 F.2d 44, 46 (3d Cir. 1993). Moreover, U.S.S.G.§ 2A3.1(b) does not require a conviction under Section 2241 for it to apply. First, unlike Section 2A3.1(a)(1), which expressly applies to a defendant convicted under Section 2241, Section 2A3.1(b) applies if the offense involved the type of conduct described in Section 2241. Furthermore, if a Section 2241 conviction were necessary for all parts of Section 2A3.1 to apply, it would render 2A3.1(a)(2) surplusage, as that

11

subsection expressly applies in circumstances where the offender is not convicted under Section 2241. Thus, the District Court had the factual and legal basis to apply Section 2A3.1 to the offense conduct involving M.S.1 and correctly assigned a base offense level of 32 for this conduct. U.S.S.G. §§ 2H4.1(b)(4)(B), 2A3.1(a)(2).

The District Court then added a four level enhancement because Omelyan forcibly raped victim M.S.1. while holding her in involuntary servitude and in a condition of peonage; a two level enhancement for serious bodily injury; a two level obstruction of justice enhancement; and a four level leadership role enhancement. These enhancements brought Omelyan's offense level to 44.

Omelyan contends that the District Court erred in applying a "leadership role" sentencing enhancement.[4] Section 3B1.1(a) of the United States Sentencing Guidelines provides that a defendant's offense level should be increased by four levels "if the defendant was an organizer or leader of a criminal activity that involved five or more participants." The Guidelines list the following factors that courts should consider when determining whether a defendant played a leadership role:

> (1) the exercise of decision making authority; (2) the nature of participation in the commission of the offense; (3) the recruitment of accomplices; (4) the claimed right to a larger share of the fruits of the crime; (5) the degree of participation in planning or organizing the offense;

---

[4] "Where, as here, a challenge is made to the calculation of the Guidelines range, the Court reviews the District Court's interpretation of the Sentencing Guidelines *de novo,* and scrutinizes any findings of fact used in the calculation for clear error." *United States v. Wood*, 526 F.3d 82, 85 (3d Cir. 2008) (internal citation omitted).

12

(6) the nature and scope of the illegal activity; and (7) the degree of control and authority exercised over others.

*United States v. Gricco,* 277 F.3d 339, 358 (3d Cir. 2002). "There need not be evidence of every factor before a defendant is found to be a 'leader or organizer.'" *United States v. Ortiz*, 878 F.2d 125, 127 (3d Cir. 1989).

The record shows that Omelyan was the only person who was involved in every aspect of the Organization's operations, both in the United States as well as abroad. Multiple victims testified that Omelyan was the leader of the Organization and that it was he who made the ultimate decision on who the Organization smuggled into the United States. The record also indicates that Omelyan ran the Organization's day-to-day activities. He dictated which victims worked under each Botsvynyuk brother, where each victim worked, and what discipline each victim received. Omelyan also planned and organized each victim's travels to the United States. Finally, Omelyan spearheaded the Organization's attempts to extort uncompensated labor and money from the victims and the victims' families in Ukraine. Given this evidence, the District Court did not err in applying a leadership enhancement.

## III.

For the foregoing reasons, we will affirm the judgments of the District Court.

13