NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 16-1446 and 16-1520
_____

UNITED STATES OF AMERICA

v.

YAROSLAV CHURUK,
a/k/a SLAVKO,
a/k/a YAROSLAV BOTSVYNYUK,

Appellant in No. 16-1446

_____

UNITED STATES OF AMERICA

v.

MYKHAYLO BOTSVYNYUK,
a/k/a MISHA,
a/k/a MYKHAILO CHURYK,
a/k/a MYKHAYLO CHURUK,

Appellant in No. 16-1520

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Crim. Nos. 2-10-cr-00159-005 and 2-10-cr-00159-003)
District Judge:  Honorable Paul S. Diamond
_____

Argued October 22, 2019

BEFORE:  GREENAWAY, JR., PORTER, and COWEN, Circuit Judges

(Filed: January 9, 2020)

———————

William M. McSwain
Daniel A. Velez (Argued)
Michelle Morgan
Office of the United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106


    Attorneys for Appellee

Alan J. Tauber (Argued for Appellant Yaroslav Churuk)
1390 Upland Terrace
Bala Cynwyd, PA 19004

Mark E. Cedrone (Argued for Appellant Mykhaylo Botsvynyuk)
Cedrone & Mancano
123 South Broad Street
Suite 810
Philadelphia, PA 19109

    Attorneys for Appellants

———————

OPINION*

———————

COWEN, Circuit Judge.

_____

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

2

In these consolidated appeals, Yaroslav Churuk ("Churuk") and Mykhaylo

Botsvynyuk ("Mykhaylo") (collectively "Appellants")[1] appeal from their respective

convictions for conspiracy to participate in a racketeering enterprise in violation of the

Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d).

Mykhaylo also challenges his sentence. We will affirm.

I.

On March 17, 2010, a federal grand jury sitting in the Eastern District of

Pennsylvania returned an indictment against five brothers—Churuk, Mykhaylo, Omelyan

Botsvynyuk ("Omelyan"), Stepan Botsvynyuk ("Stepan"), and Dmtyro Botsvynyuk

("Dmytryo") (collectively the "Botsvynyuks"). Count One charged the Botsvynyuks

with conspiracy to conduct a racketeering enterprise in violation of § 1962(d) (while

Counts Two and Three charged Omelyan with extortion under the Hobbs Act, 18 U.S.C.

§ 1951, and Count Four charged Stepan with Hobbs Act extortion).

Viewing the evidence "in the light most favorable to the government"

(Mykhaylo's Brief at 9 n.6 (citing United States v. Kemp, 500 F.3d 257, 284 (3d Cir.

2007))), Appellants together with their brothers, operated an international human

trafficking ring (i.e., the "Botsvynyuk Organization") that recruited young Ukrainian men

and women to work for them with the promise of good paying jobs and a better life in the

United States. Instead, the Botsvynyuk Organization held the workers under conditions

of peonage and involuntary servitude, using violence and threats of violence to keep them

---

[1] The use of first names throughout the opinion is not out of disrespect for any individual but to help distinguish family members with the same last name.

3

in line. These men and women were smuggled into the United States through Mexico. They were told that they owed substantial debts for their travel to the United States. Once they arrived in Philadelphia, the Botsvynyuk Organization forced the victims to work long hours cleaning commercial buildings and private residences and subjected them to deplorable living conditions as well as physical and verbal abuse. Payment for their labor went directly to the Botsvynyuk Organization, which also confiscated their identification, travel documents, and immigration papers. When the victims escaped, they and their family members were threatened.

In 2011, a jury found Omelyan and Stepan guilty of RICO conspiracy (and found Omelyan guilty on one of the Hobbs Act charges). In 2012, the United States District Court for the Eastern District of Pennsylvania sentenced Omelyan to a term of life imprisonment on the RICO conspiracy charge and a consecutive term of 240 months' imprisonment for extortion. Stepan was sentenced to a term of 240 months' imprisonment. Both brothers appealed their convictions, while Omelyan also challenged his sentence. We affirmed. See United States v. Botsvynyuk, 552 F. App'x 178 (3d Cir. 2014).

Appellants were arrested in Canada and challenged their extradition to the United States. They were extradited in 2012 and were tried in 2015.[2]

The jury found Appellants guilty of RICO conspiracy. The District Court sentenced both Churuk and Mykhaylo to 240 months' imprisonment (as well as three

___

[2] Dmytro resides in Ukraine, which does not have an extradition treaty with the United States.

4

years of supervised release), and they were ordered to pay restitution in the amount of $288,272.28 (jointly and severally with each other and with Omelyan and Stepan).

## II.

Appellants raise numerous issues in these consolidated appeals.[3]  Having considered their arguments, the record, and the governing legal principles, we determine that the District Court did not commit any reversible error.  On the contrary, it carefully and appropriately handled a lengthy and complicated proceeding.

## A.    Extraterritoriality

Mykhaylo argues that the indictment should have been dismissed because it failed to allege that he engaged in criminal activity within the territorial jurisdiction of the United States.[4]  Invoking RICO's five-year statute of limitations, see 18 U.S.C. § 3282(a), he also contends that the indictment did not allege any conduct on the part of the co-conspirators satisfying both the territorial jurisdiction requirement as well as the applicable statute of limitations, i.e., criminal conduct occurring in the United States after March 17, 2005 (within the five years preceding the date the indictment was returned). We disagree.

The indictment adequately alleged Appellants were part of a criminal enterprise

---

[3] The District Court possessed subject matter jurisdiction pursuant to 18 U.S.C. §3231.  We have appellate jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

Pursuant to Federal Rule of Appellate Procedure 28(i), Churuk joins and adopts by reference Mykhaylo's arguments (except for his brother's sentencing argument).

[4] We exercise plenary review over the District Court's legal conclusions and review any findings of fact for clear error.  See, e.g., United States v. Huet, 665 F.3d 588, 594 (3d Cir. 2012).

that was intended to have an effect in the United States and, in fact, involved criminal conduct in this country. In fact, it identified numerous specific acts committed by the co-conspirators in the United States. This is not surprising given the fact that the alleged forced labor (i.e., the cleaning services) occurred in the United States. In turn, "the government has the power to prosecute every member of a conspiracy that takes place in United States territory, even those conspirators who never entered the United States." United States v. Inco Bank & Trust Corp., 845 F.2d 919, 920 (11th Cir. 1988) (citing Ford v. United States, 273 U.S. 593, 620-24 (1927); United States v. Lawson, 507 F.2d 443, 445 (7th Cir. 1974); United States v. Correa-Negron, 462 F.2d 613, 614 (9th Cir. 1972)). According to the indictment, the RICO conspiracy existed from at least the fall of 2000 through in or around the spring of 2007. In addition to specifying several pre-2005 acts that occurred in the United States, the indictment alleged criminal conduct in Ukraine within the limitations period—specifically threats Omelyan made to Nadia Yashuk between 2005 and 2007. Furthermore, the statute of limitations is not an element of the offense, and a RICO conspiracy conviction does not require proof of an overt act either within or before the limitations period.[5] See, e.g., Smith v. United States, 568 U.S. 106, 111-12 (2013); Salinas v. United States, 522 U.S. 52, 63 (1997).

## B.    The 2014 Recording

The government presented at trial a recording of a telephone call that Omelyan

---

[5] At oral argument, counsel for Mykhaylo chose to rest on his briefing on the issue of extraterritoriality. He admitted that he does not have any case for the principle of law that, just because his client did not allegedly commit an act in the United States, the RICO conspiracy provision could not apply.

made in 2014 (from prison) to Yashuk.[6]  In short, during the call "Omelyan asked Yashuk to tell her son [Victor Shakhmarova] and daughter-in-law [M.S.1] to change their stories about him and help him."  (Appellee's Brief at 17 n.7.)  "Yashuk reminded Omelyan about the threats he [had] made to her in the past, and he admitted [or at least did not deny] that he made those threats [or someone who called in his name had done so] but claimed he would never have acted on them."[7]  (Id.)

Specifically, Yashuk testified about a series of threatening interactions with Omelyan, including several incidents that occurred within the statute of limitations period.  She testified that, in late 2002, Omelyan called her in Ukraine.  He told her that her son and daughter-in-law had escaped.  If she did not tell him where they were, "he will have to deal with us, with me and with the granddaughter," and he would travel to Ukraine so that "our unashamed blood will cover us."  (A366.)  She subsequently received another call from someone using a Georgian accent (possibly Omelyan himself) who threatened to stab her and her granddaughter.  Omelyan called Yashuk again, saying that "I will come and your unashamed blood will cover both you and your granddaughter."  (A369.)  Beginning in 2015, Omelyan visited Yashuk's home in the Ukraine (and on one occasion claimed his brother "Misha" (Mykhaylo) was sitting in the car).  Omeylan urged Yashuk to testify for him in a Ukrainian investigation and offered

---

[6] We generally review evidentiary rulings for an abuse of discretion while exercising plenary review to the extent such rulings are based on an interpretation of the Federal Rules of Evidence.  See, e.g., United States v. Serafini, 233 F.3d 758, 768 n.14 (3d Cir. 2000).  Whether a statement constitutes hearsay is a question of law subject to plenary review, and the application of a hearsay exception is reviewed for abuse of discretion.  See, e.g., United States v. Price, 458 F.3d 202, 205 (3d Cir. 2006).

[7] Omelyan raped M.S.1.

7

her money to do so. If she did not, "maybe your granddaughter won't make it to school one day or there might be an accident." (A369.) "He said that if it doesn't happen, then maybe [there would be] an accident or he might give the granddaughter to the prostitution house to make money to pay off the debt of the parents." (A370.) According to Yashuk, Omelyan approached her in 2007 at a bus stop in Ukraine. He asked her about her son's whereabouts and said he hoped the son was still healthy so "I can handle him, deal with him." (A374.) Appellants vigorously attacked the credibility of the government's witnesses including Yashuk, characterizing them as liars who simply sought visas to remain in the United States.

The District Court properly overruled Mykhaylo's hearsay objection, and it appropriately determined that this recording was admissible for the limited purpose of responding to the defense's attack on Yashuk's credibility. In any event, we believe that, even if the District Court erroneously admitted this piece of evidence, its error was harmless.

Mykhaylo argues that the recording constituted inadmissible hearsay on the grounds that it was offered for the truth of the matters asserted in the recording, did not fall within any one of the delineated hearsay exceptions, and did not qualify as non-hearsay under the Federal Rules of Evidence. See, e.g., Fed R. Evid. 801(c)(2) (defining hearsay as, inter alia, "a statement" that "a party offers in evidence to prove the truth of the matter asserted in the statement"), Fed. R. Evid. 801(d) (setting forth categories of statements that are not hearsay), Fed. R. Evid. 802 (stating hearsay is not admissible unless federal statute, Federal Rules of Evidence, or other rules prescribed by Supreme

8

Court provides otherwise), Fed. R. Evid. 803 ("Exceptions to the Rule Against Hearsay—Regardless of Whether the Declarant is Available as a Witness"); Fed. R. Evid. 804 ("Hearsay Exceptions—When the Declarant is Unavailable as a Witness"). In particular, he insists that the evidence did not rise to the level of an admissible co-conspirator statement under Federal Rule of Evidence 801(d)(2)(E) (statement is not hearsay if made by opposing party's coconspirator during and in furtherance of the conspiracy). However, the District Court ultimately indicated that the recording was not admissible as a statement by a co-conspirator. The recording accordingly could not be considered as evidence that the conspiracy itself continued into the limitations period. Instead, the District Court indicated that the recording was admissible as "a [purportedly] consistent statement confirming the existence of the prior conversation, which you[, the defense,] said never happened, but they're both talking about it."[8] (A1567.) In other words, it was admitted—not for the truth of the matters asserted—but simply to support Yashuk's credibility. For his part, Mykhaylo does not cite to any case law stating that it would be error to admit this sort of evidence for such a limited purpose. In fact, the District Court offered to give a cautionary instruction as part of its final charge to the jury regarding the

---

[8] The government also appropriately observes that the recording has certain "built-in" elements of reliability. After all, it was Omelyan who called Yashuk, she did not know the conversation was being recorded, and she was confronting the person who she claimed had repeatedly threatened her and her family. Omelyan's statements also would appear to be inconsistent with his penal interest. See Fed. R. Evid. 804(b)(3). Although Omelyan claimed that Yashuk's son and daughter-in-law had lied to get their green cards, he still wanted Yashuk to ask them to change their testimony. When Yashuk confronted Omelyan with the various threats he had made, he did not deny he (or someone speaking in his name) had made them (and instead essentially said he did not mean it (e.g., "You know to say it is one thing, to do it is something else." (A1665))).

9

evidentiary value of the recording.  But defense counsel for both Appellants declined the invitation.

As Mykhaylo acknowledges, erroneously admitted evidence is harmless if "it is highly probable that the improperly admitted evidence did not contribute to the jury's judgment of conviction."  United States v. Sallins, 993 F.2d 344, 348 (3d Cir. 1993) (citing Gov't of the V.I. v. Toto, 529 F.2d 278, 284 (3d Cr. 1976)).  We again note that a RICO conspiracy conviction does not require proof of any overt act (whether within the limitations period or not).  See, e.g., Salinas, 522 U.S. at 63.  The government presented extensive evidence establishing a continuing pattern of threatening behavior—which closely resembled the incidents described by Yashuk and continued after March 17, 2015.  In short, if the Botsvynyuks were unable to discover the location of an escaped victim through the remaining workers, Omelyan would threaten the victim's relatives in Ukraine in order to discover the victim's location or to recoup the debt that the victim purportedly owed them.  Accordingly, "the government presented evidence of an alleged 2009 incident during which Omelyan . . . visited the home of Olga [H]aramita but was turned away."  (Mykhaylo's Brief at 14-15.)  Although Omelyan said nothing and Haramita testified that she did not know what he would have said, she also claimed that he had made repeated threats in the past after her daughter's escape, e.g., threatening that he would find her daughter if she did not return and then either kill her or force her into prostitution.  Omelyan called victim Taras Petrunyk's mother (Svitlana Zaiats) more than once, telling her she would never again see her son alive.  According to Zaiats, Omelyan threatened to rape Zaiats and burn her house down unless she disclosed her son's

10

location. He threatened to kidnap her youngest son and send her one finger at a time until she complied. Given these circumstances, we believe "'that the judgment was not substantially swayed by [the admission of the 2014 recording].'" United States v. Lopez, 340 F.3d 169, 177 (3d Cir. 2003) (quoting Toto, 529 F.2d at 283).

## C. The "Georgian" Telephone Call

Mykhaylo challenges the District Court's admission of Yashuk's testimony about the threatening telephone call she received from either Omelyan using a Georgian accent or someone else using such an accent. According to him, the testimony was inadmissible because the witness could not identify the speaker (and accordingly could not satisfy Federal Rule of Evidence 901 ("Authenticating or Identifying Evidence")), and, in the absence of such an identification (and a timeframe for the telephone call), it could not be determined whether the testimony was admissible as a statement of a co-conspirator made in furtherance (and during the existence) of the conspiracy under Rule 801(d)(2)(E). However, the "Georgian" threat adequately demonstrated a conspiratorial connection between the declarant and Omelyan, and, by extension, with the other Botsvynyuk brothers. See, e.g., United States v. Cruz, 910 F.2d 1072, 1081-82 & n.10 (3d Cir. 1990) (indicating that statement of unidentified declarant suggesting conspiratorial connection between declarant and defendants was properly admitted under Rule 801(d)(2)(E) where totality of circumstances suggested conspiratorial connection and that, although unidentifiability may be important, it was not particularly significant because statement and surrounding circumstances provided sufficient evidence of reliability). In his reply brief, Mykhaylo acknowledges that "[a] fair reading of the trial

11

record places this alleged call in the 2003 timeframe." (Mykhaylo's Reply Brief at 2 n.5)

**D.     The 2011 Threat by the Botsvynyuk Sister**

The District Court allowed I.S.[9] and her husband Mykhaylo Tomiyuk to testify about a 2011 visit to their home in Ukraine by the Botsvynyuks' sister. According to the couple, Pasha Botsvynyuk ("Pasha") threatened them, and, as a result, they decided to return to the United States. According to Mykhaylo, this evidence constituted hearsay that could not have been admitted under Rule 801(d)(2)(E). We conclude that this evidence was properly admitted—not as statements of a co-conspirator—but to explain why these witnesses came to the United States in response to the defense's portrayal of the victims as motivated by a desire to obtain legal status

**E.     "Climate of Fear" Evidence**

Both Appellants challenge the admissibility of the "climate of fear" evidence, although they rely on different theories to do so. This evidence was admitted to establish the witnesses' fearful state of mind under Rules 801(c)(1) and 803(3) (and not for the truth of the matters asserted). However, Mykhaylo contends that this evidence does not satisfy the personal knowledge requirement. See Fed. R. Evid. 602. Churuk argues that the District Court erroneously permitted the witnesses to testify to repetitive and inflammatory statements regarding the Botsvynyuks' various crimes, making it impossible for the jury to consider such evidence for its ostensibly limited purpose. In addition to attacking the District Court's jury instruction as too perfunctory, Churuk asserts that, "if its goal was truly to establish the existence of a climate of fear, the

---

[9] Like M.S.1, I.S. was raped by Mykhaylo.

government possessed a clear evidentiary alternative based upon the witnesses' alleged firsthand experience" and that the "ostensible purpose of the out-of-court accusations was belied by the government's own evidence" because all of the witnesses eventually left the Botsvynyuks (and continued to live and work illegally in the United States). (Churuk's Brief at 51 (relying on Old Chief v. United States, 519 U.S. 172 (1997)).)

Nevertheless, it appears undisputed that (as Mykhaylo puts it) "evidence along these lines may be admissible for a purpose of establishing the witness's state of mind, as opposed to for the truth of the matter asserted" (Mykhaylo's Brief at 60). Furthermore, the prosecution "may fairly seek to place its evidence before the jurors, as much to tell a story of guiltiness as to support an inference of guilt, to convince the jurors that a guilty verdict would be morally reasonable as much as to point to the discrete elements of a defendant's legal fault." Old Chief, 519 U.S. at 188 (citing United States v. Gilliam, 994 F.2d 97, 100-02 (2d Cir. 1993)). The District Court also instructed the jury more than once that this sort of testimony could not be considered for its truth (e.g., "that the workers were abused" (A1274)) and instead could only be considered for the limited purpose of assessing the witnesses' state of mind (and why they took or failed to take certain actions). In fact, counsel for both Churuk and Mykhaylo expressed their satisfaction with the specific instruction that Churuk now attacks on appeal, and they declined the District Court's invitation to give any additional cautionary instructions in the final charge.

## F. Identification

In 2000, Yelena Shuster was dating Vitaliy Lytvynyuk and accompanied him to a

13

scheduled immigration court appearance in Chicago. Two men suddenly accosted

Lytvynyuk and took him away. In a 2015 photo array, Shuster identified Churuk as one

of the two men.[10] Churuk asserts that the District Court abused its discretion by denying

his motion to suppress the photographic identification evidence.[11] We believe that the

District Court appropriately disposed of his motion on the grounds that Shuster's

identification of Churuk was not unduly suggestive.

"A due process violation can result when an identification procedure is so

suggestive that it undermines the reliability of the resulting identification." United States

v. Lawrence, 349 F.3d 109, 115 (3d Cir. 2003). This inquiry implicates a two-step

process. "The first question is whether the initial identification was 'unnecessarily' or

'impermissibly' suggestive." United States v. Stevens, 935 F.2d 1380, 1389 (3d Cir.

1991). If the procedure is found to have been unnecessarily suggestive, the second

question is whether it was so conducive to mistaken identification or gave rise to such a

substantial likelihood of misidentification that the admission of the identification would

constitute a denial of due process. Id.; see also, e.g., Thomas v. Varner, 428 F.3d 491,

503 (3d Cir. 2005).

The District Court appropriately disposed of Churuk's motion based on the

threshold "suggestiveness" prong. According to Churuk, "[e]ven the trial court was

---

[10] Shuster identified Bogdan Pulyk as the other man. Pulyk was deceased at the time of trial.
[11] We review a district court's ruling on the admissibility of identification testimony for an abuse of discretion. See, e.g., United States v. Brownlee, 454 F.3d 131, 137 (3d Cir. 2006) (noting that when motion to suppress has been denied findings of fact are reviewed for clear error and legal conclusions are assessed under plenary standard).

14

constrained to admit that the [photo array] fillers bore no resemblance to Mr. Churuk," and "Appellant's picture stood out from the others because it was taken at a greater distance from the camera than the other photos and because it was more 'grainy' than the others." (Churuk's Brief at 35 (citing JA1448) (footnote omitted).) But the District Court acknowledged that there were some small differences in perspective between the photographs and that two of the individuals appeared to be closer to the camera. It appropriately determined that, "although I would not say these guys could all be brothers, . . . I don't think that's the standard." (A1448). In its written disposition, the District Court properly explained that the men in two of the six photographs in the array (the photographs specifically challenged below by the defense) bore sufficient resemblance to Churuk. There were no significant differences in the size, format, angle, or overall appearance of the photographs. "A photographic array is not unnecessarily suggestive solely because certain characteristics of a defendant or photograph set him apart from the other persons pictured in the array."[12] United States v. Burnett, 773 F.3d 122, 133-34 (3d Cir. 2014) (citing Reese v. Fulcomer, 946 F.2d 247, 260 (3d Cir. 1991); United States v. Dowling, 946 F.2d 114, 117 (3d Cir. 1988)).

### F. Jury Instructions and the Statute of Limitations

According to Mykhaylo, "[t]he District Court erred when it instructed the jury on the statute of limitations charge issue by shifting the burden of proof to Appellants,

_____

[12] Especially given the District Court's specific findings, we do not accept Churuk's suggestion that the District Court's purportedly "cheeky" comment that "I would not say these guys could all be brothers" somehow constituted a finding that the other photographs did not bear a substantial resemblance to Churuk.

15

inviting the jury to consider inadmissible evidence when considering the issue and suggesting a continuing conspiracy when the conspiracy was long complete."[13] (Mykhaylo's Brief at 40 (emphasis omitted).)  The District Court did not commit a reversible error with respect to its jury instruction on the statute of limitations.

Mykhaylo specifically attacks the following sentence in the final jury charge: "'For RICO conspiracy, once the Government meets its burden of proof to establish the conspiracy, it is entitled to a presumption that the conspiracy continued to exist until [Appellants] demonstrate otherwise.'" (Id. at 44 (citing A1992-A1993).)  According to Mykhaylo, the District Court (as well as the government) "seems to have confused the burden of proof governing the issue of a defendant's withdrawal from a conspiracy with the parties' respective burden of proof concerning the statute of limitations."  (Id.)  Unlike the general conspiracy offense, see 18 U.S.C. § 371, RICO conspiracy does not require proof of any overt act.  See, e.g., Salinas, 552 U.S. at 63.  Accordingly, the prosecution need not prove that an overt act occurred within the limitations period.  However, "the Government must prove the time of the conspiracy offense if a statute-of-limitations defense is raised."  Smith, 568 U.S. at 113 (citing Grunewald v. United States, 353 U.S. 391, 396 (1957)).  This burden is satisfied if the prosecution proves that the conspiracy "continued past the statute-of-limitations period."  Id.  "For the offense in

---

[13] We consider whether the charge as a whole fairly and adequately submitted issues in the case to the jury.  See, e.g., United States v. Zehrbach, 47 F.3d 1252, 1264 (3d Cir. 1995). The Court exercises plenary review to determine whether the instructions stated the proper legal standard and whether it improperly shifted the burden of proof. See, e.g., United States v. Korey, 472 F.3d 89, 93 (3d Cir. 2007); Zehrbach, 47 F.3d at 1260-64.

16

these conspiracy prosecutions was not the initial act of agreement, but the banding-together against the law effected by the act, which continues until termination of the conspiracy or, as to a particular defendant, until the defendant's withdrawal." Id. In turn, "the burden of establishing withdrawal rests upon the defendant." Id. "Here, Appellants have not alleged withdrawal from or renunciation of the charged conspiracy. Instead, Appellants asserted and continue to assert the government failed to prove any conduct occurring within the limitations period." (Mykhaylo's Reply Brief at 8.) According to Mykhaylo, the government had the burden to prove such conspiratorial conduct occurred within the limitations period, and the District Court committed reversible error by shifting this burden of proof to the defense.

The District Court's statute-of-limitations instruction, considered in its entirety, did not improperly shift the applicable burden of proof.

"The district court instructed the jury that to find the indictment was timely filed, it must 'determine from all the evidence whether the conspiracy continued to exist between March 17th, 2005 and the indictment date, March 17th, 2010.'" (Mykhaylo's Brief at 40-41 (quoting A1991).) "[T]he Government can establish the continuation of the conspiracy" with evidence that any acts of any one or more of the alleged types of racketeering activities (i.e., peonage, involuntary servitude, extortion, and immigration violations) at issue in this case "continued" within the five-year period. (A1991). After summarizing "some of the discreet evidence the government 'argue[d] that it presented' to prove the conspiracy continued 'well beyond March 17th, 2005'" (Mykhaylo's Brief at 41 (quoting A1991)), the District Court then provided the jury with a thorough

17

explanation of what was required to satisfy the statute of limitations:

> The limitations period begins to be calculated only when the crime is complete.  For RICO conspiracy, this does not occur until the purposes of the conspiracy [have] either been accomplished or abandoned.  The Government alleges that the purposes of the charged conspiracy were not accomplished or abandoned until at least 2009 because debts of some of the alleged victims of the Botsvynyuk organization remained outstanding after March 17th, 2005.
>
> It is not required that the Government prove an overt act within the five-year period.  Although you may consider any such overt acts in making your determination.  If you find that the goals of the conspiracy had not yet been accomplished or abandoned as of March 17th, 2005, then you can find that the indictment was timely filed.
>
> For RICO conspiracy, once the Government meets its burden of proof to establish the conspiracy, it is entitled to a presumption that the conspiracy continued to exist until the defendants demonstrate otherwise.
>
> Conspiracy is a continuing offense and you may consider each and all of any of the conspirators' actions in furtherance of the conspiracy, providing the conspiracy continued into the limitations period, until there is some affirmative showing that it has ended or that all its members have withdrawn.

(A1992-A1993.)

The District Court did not relieve the government of its burden of proving the existence and time-frame of the conspiracy.  It appears well established that a RICO conspiracy constitutes a continuing offense that is not complete until its purposes have either been accomplished or abandoned.  See, e.g., United States v. Yanotti, 541 F.3d 112, 123 (2d Cir. 2008); United States v. Saadey, 393 F.3d 669, 677 (6th Cir. 2005); Manna v. U.S. Dep't of Justice, 51 F.3d 1158, 1168 n.1 (3d Cir. 1995) (Becker, J., concurring in part and dissenting in part).  Mykhaylo relies on the commentary to the Third Circuit model jury instructions, which explains that, while the defendant bears the

18

burden of proving withdrawal, "the Court in <u>Smith</u> acknowledged, however, that 'we have held that the Government must prove the time of the conspiracy offense if a statute-of-limitations defense is raised.'" 3d Cir. Model Criminal Jury Instruction 8.01 cmt. (quoting <u>Smith</u>, 568 U.S. at 113); <u>see also, e.g.</u>, 3d Cir. Model Criminal Jury Instruction 6.18.1962D cmt. (observing that, although RICO conspiracy does not include an overt act element, federal courts otherwise apply traditional conspiracy principles and a district judge should give instructions applicable to conspiracy generally, including, if raised by defense, instruction for withdrawal). We note that, like the District Court, the model instructions also recognize that "[a] conspiracy ends when the objectives of the conspiracy have been achieved or when all members have withdrawn from it." 3d Cir. Model Criminal Jury Instruction 6.18.371I. "[A] conspiracy may be a continuing conspiracy and if it is, it lasts until there is some affirmative showing that it has ended or that all of its members have withdrawn." <u>Id.</u> (further stating that conspiracy may be continuing if agreement includes understanding conspiracy will continue over time or conspiracy has continuing purpose or objective).

We also note that the District Court's language was actually based on Second Circuit case law, specifically <u>United States v. Spero</u>, 331 F.3d 57, 61 (2d Cir. 2003) ("Accordingly, once the Government met its burden of proof by establishing that the loansharking conspiracy existed, it was entitled to a presumption that the conspiracy continued until defendant demonstrated otherwise."). Mykhaylo attempts to distinguish the cases cited by the government on the grounds that they largely involved "withdrawal from conspiracies as opposed to failure of proof." (Mykhaylo's Reply Brief at 7).

19

However, Spero's reasoning clearly implicated both concepts (e.g., "'[w]here a conspiracy contemplates a continuity of purpose and a continued performance of acts, it *is presumed to exist* until there has been affirmative showing that it has been terminated[,] and its members continue to be conspirators until there has been an affirmative showing that they have withdrawn,'" id. at 60 (quoting United States v. Mayes, 512 F.2d 637, 642 (6th Cir. 1975) (alterations and emphasis in the original)). Spero himself failed to prove that the objectives of the conspiracy were accomplished before the limitations period (and also did not establish that he abandoned the conspiracy before that date).[14] Id. at 60-61.

According to Mykhaylo, "the district court instructed the jury that in determining the statute of limitations issue, it should consider specific post-March 17, 2005 instances of conduct." (Mykhaylo's Brief at 47.) The District Court reminded the jury that:

> The Government argues that it has presented evidence that the conspiracy continued well beyond March 17th, 2005. Including in the evidence the Government has offered is the following:
>
> One. Evidence that from in or around spring 2005 to in and around spring 2006, Omelyan Botsvynyuk visited Nadia Yashuk in Ukraine and threatened to take her granddaughter to a brothel.
>
> Two. Evidence that from in or around spring 2005 to in or around spring 2006, Omelyan Botsvynyuk visited Nadia Yashuk and threatened her a second time.
>
> Three. Evidence that in or around the spring of 2007, in Ukraine, Omelyan Botsvynyuk asked Nadia Yashuk about the whereabouts of her son.

---

[14] In fact, Mykhaylo acknowledges that "the government correctly summarizes one portion of Spero's holding." (Mykhaylo's Reply Brief at 7.)

20

And four. Evidence that in or around 2009, Omelyan Botsvynyuk
visited the home of Olga [H]aramita but was turned away.

(A1991-A1992.) Mykhaylo argues that this language permitted the jury to consider

other conduct as evidence that the conspiracy continued to exist beyond March 17, 2005,

including Pasha's confrontation with I.S. and Tomiyuk and (especially) the recording of

the 2014 telephone call Omelyan made to Yashuk. We believe that he has read too much

into the District Court's jury charge. We have already explained that this evidence was

properly admitted for other limited purposes (and not to establish that the conspiracy

continued into the limitations period). In fact, the defense turned down the District

Court's express invitation to provide a cautionary instruction in the final charge regarding

the 2014 recording. We also do not agree that the jury should have been required to

reach a unanimous verdict as to which specific incidents it found had occurred within the

limitations period. The statute of limitations is not an element of the offense but an

affirmative defense that must be raised by the defendant or it is waived (and a RICO

conspiracy conviction does not require proof of any overt act either within or before the

limitations period). See, e.g., Smith, 568 U.S. at 111-12; Salinas, 552 U.S. at 63.

Mykhaylo does not cite to any case stating that the jury must make unanimous findings

regarding which conspiratorial acts, if any, occurred within the limitations period.

Finally, the District Court did not commit reversible error by suggesting to the jury

that the conspiracy was still in existence at the time of trial. Mykhaylo takes issue with

the District Court's instruction concerning unpaid debts: "The Government alleges that

the purposes of the charged conspiracy were not accomplished or abandoned until at least

21

2009 because debts of some of the alleged victims of the Botsvynyuk organization remained outstanding after March 17th, 2005." (A1992.) The extortionate collection of debts was a purpose of the charged conspiracy, and each act to collect on an allegedly outstanding debt would then serve to further the conspiracy. In contrast, the subsequent payments or other conduct at issue in the two decisions cited by Mykhaylo did not further the original conspiracies. See United States v. Grimm, 738 F.3d 498, 501-04 (2d Cir. 2013); United States v. Bornman, 559 F.3d 150, 152-55 (3d Cir. 2009).

## G.    Constructive Amendment and Variance

Mykhaylo similarly argues that the jury instructions and the government's arguments constructively amended the alleged timeframe of the conspiracy. According to him, the indictment alleged a conspiracy with discrete temporal parameters—"[f]rom at least the fall of 2000 through in or around the spring of 2007" (A110)—and alleged several discrete acts within the limitations period (i.e., the 2005/2006 and 2007 incidents involving Omelyan and Yashuk). However, the government purportedly introduced evidence of additional post-2007 conduct (i.e., the 2009 Haramita incident, the 2011 Pasha confrontation, and the 2014 Omelyan telephone recording) "which dramatically implicated and altered the jury's consideration of the statute of limitations issue" (Mykhaylo's Brief at 54). Mykhaylo further contends that the District Court's instructions (especially the language regarding unpaid debts) impermissibly altered the temporal parameters of the indictment. In short, the District Court and the government purportedly turned an alleged conspiracy with a specific end date into an open-ended "outstanding debts" scheme that continues to exist. Mykhaylo also argues that, even if

22

the modification did not rise to the level of constructive amendment, it constituted a prejudicial variance (and that the defense's failure to articulate a cogent theory of prejudice at the charging conference was itself a result of surprise).

The indictment was not constructively amended.[15] "An indictment is constructively amended when, in the absence of a formal amendment, the evidence and jury instructions at trial modify essential terms of the charged offense in such a way that there is a substantial likelihood that the jury may have convicted the defendant for an offense differing from the offense the indictment returned by the grand jury actually charged." United States v. Daraio, 445 F.3d 253, 259-60 (3d Cir. 2006) (footnote omitted) (citing United States v. Miller, 471 U.S. 130, 140 (1985)); see also, e.g., United States v. McKee, 506 F.3d 225, 229 (3d Cir. 2007) ("An indictment is constructively amended when evidence, arguments, or the district court's jury instructions effectively 'amend[s] the indictment by broadening the possible bases for conviction from that which appear in the indictment.'" (quoting United States v. Lee, 359 F.3d 194, 208 (3d Cir. 2004) (alterations in the original)). As the government explains, "[t]he evidence regarding 'debts' owed to the defendants was proof of the charged predicate offenses and showed their motive for extorting the victims and their families." (Appellee's Brief at 93.) The indictment accordingly identified the purposes of their conspiracy as enriching the members and associates of the Botsvynyuk Organization through, among other things, human trafficking, harboring illegal aliens, unlawful conduct with respect to

---

[15] We exercise plenary review to determine whether there was either a constructive amendment or a variance. See, e.g., United States v. Daraio, 445 F.3d 253, 259 (3d Cir. 2006).

23

passports and immigration documents, and forced human labor. It then alleged that the pattern of racketeering activity consisted of four types of acts, including extortion. "The attempts to collect the 'debts' of the victims and extortionate conduct that was used to do so was part of and furthered the purposes of the racketeering conspiracy." (Id. at 94.) Although considering evidence that occurred "before the timeframe alleged in the Indictment" and observing that proof of the acts charged in the indictment within the statute of limitations and before the return of the indictment is sufficient to support the conviction (Mykhaylo's Reply Brief at 11), this Court still concluded that a time variance between the indictment's allegations and proof at trial did not rise to the level of a constructive amendment or prejudicial variance because the time of the offense does not constitute an element under the Hobbs or the Travel Acts. United States v. Somers¸496 F.2d 724, 742-46 (3d Cir. 1974)). As Mykhaylo acknowledges in his reply brief, the statute of limitations is not an element of the offense of RICO conspiracy. See, e.g.¸Smith¸568 U.S. at 111-12.[16]

It is well established that a variance occurs when "the evidence at trial proves facts materially different from those alleged in the indictment." (Mykhaylo's Brief at 55 (citing McKee, 506 F.3d at 231 n.7).) In this case, "the indictment clearly stated that . . . the victims incurred 'debts' by being smuggled into the United States, that the defendants used these 'debts' to maintain the victims in conditions of peonage and involuntary servitude, and [that] the defendants used extortionate threats and acts against the victims

---

[16] We yet again reiterate that the 2009 Pasha confrontation as well as the 2014 recording were not admitted as evidence that the conspiracy itself continued into the limitations period.

24

and their families in Ukraine to collect these owed 'debts.'" (Appellee's Brief at 96).

Defense counsel were also unable to articulate how their clients were prejudiced when asked to do so during the charging conference by the District Court (with Mykhaylo's attorney even admitting that he knew of the evidence and that he was not surprised by it but claiming prejudice "by including something in the charge that I don't believe is required to be in the charge" (A1923)).

## H.     Recusal

The District Court did not abuse its discretion by denying Churuk's motion for recusal.[17]

"Biases stemming from facts gleaned during judicial proceedings themselves must be particularly strong in order to merit recusal." United States v. Antar, 53 F.3d 568, 574 (3d Cir. 1995), overruled on other grounds by Smith v. Berg, 247 F.3d 542 (3d Cir. 2001). "[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." Liteky v. United States, 510 U.S. 540, 555 (1994). Churuk focuses on two types of statements made by the District Court at Stepan's restitution hearing: (1) "Based on facts gleaned from the trial of Stepan Botsvynyuk -- and before even hearing the defense case in this matter -- the Court has already labeled defendants Yaroslav Churuk and Mykhaylo Botsvynyuk as

---

[17] We review the denial of a motion to recuse for abuse of discretion. See, e.g., Selkridge v. United of Omaha Life Ins. Co., 360 F.3d 155, 166 (3d Cir. 2004).

25

tyrants and slave traders who pushed their alleged victims to work 'ungodly' hours;" and (2) "In addition, the Court has made statements indicating that if defendants Yaroslav Churuk and Mykhaylo Botsvynyuk are convicted, it believes that they should be jointly and severally liable for $288,272 in restitution despite the fact that the Court could exercise its discretion to take the more lenient course of apportioning restitution according to culpability." (Churuk's Brief at 54.) However, the District Judge appropriately explained that his comments at Stepan's restitution hearing were a fair summary of the evidence presented regarding the uncompensated work performed by the Botsvynyuk Organization's victims, and he acknowledged his discretion in apportioning liability. Churuk compares the comments regarding restitution liability to the statements made by the district judge in Antar. But the District Judge here did not tell the parties "in stark, plain, and unambiguous language" that "his goal in the criminal case, from the beginning, was something other than what it should have been," i.e., "to enforce a repatriation order and final judgment issued during a concurrent civil proceeding and give back the proceeds recovered to the public." Antar, 53 F.3d at 576.

## I.    Procedural and Substantive Reasonableness

Finally, we reject Mykhaylo's challenge of the procedural as well as the substantive reasonableness of his sentence.[18]

---

[18]  We exercise plenary review of a district court's interpretation of the Sentencing Guidelines and review its factual findings for clear error. See, e.g., United States v. Grier, 475 F.3d 556, 570 (3d Cir. 2007) (en banc). If there is no procedural error, the Court reviews for substantive unreasonableness and will reverse if no reasonable sentencing court would have imposed the same sentence for the reasons the district court provided. See, e.g., United States v. Fumo, 655 F.3d 288, 308 (3d Cir. 2011).

26

As to procedural reasonableness, Mykhaylo contends that the District Court "erroneously assumed [he] should be held accountable for conduct relating to peonage/involuntary servitude, disregarding the general verdict that the jury returned." (Mykhaylo's Brief at 63.) He argues that the District Court should have applied U.S.S.G. § 1B1.2(d), which states that, for a charge of conspiracy to commit more than one offense, the conviction "shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendants conspired to commit." In cases where the jury returns a general verdict, § 1B1.2(d) requires the sentencing court to determine whether it would find the defendant guilty beyond a reasonable doubt of conspiring to commit the particular object offense. See, e.g., U.S.S.G. § 1B1.2 cmt. n.4; United States v. Conley, 92 F.3d 157, 163-69 (3d Cir. 1996). However, every circuit court to have considered the issue (with one exception) has concluded that this framework does not apply in the context of RICO conspiracy. See, e.g., United States v. Barragan, 871 F.3d 689, 715-19 (9th Cir. 2017); United States v. Garcia, 754 F.3d 460, 482-83 (7th Cir. 2014); United Sates v. Massino, 546 F.3d 123, 135-36 (2d Cir. 2008); United States v. Corrado, 227 F.3d 528, 541-42 (6th Cir. 2000); United States v. Carrozza, 4 F.3d 70, 74-80 (1st Cir. 1993). But see, e.g., United States v. Nguyen, 255 F.3d 1335, 1340-42 (11th Cir. 2001). They have adopted this approach because, unlike the general conspiracy statute that permits charging multiple objects, RICO conspiracy constitutes a "single object" offense (the object being to engage in racketeering). See, e.g., Barragan, 871 F.3d at 717. In turn, the record in this case supports the finding that Mykhaylo should be held responsible for more than just the immigration offenses (for

27

instance, the evidence established that he ran his own work crew and was aware his brothers were doing the same). See U.S.S.G. § 1B1.3(a)(1)(B) (observing that, in context of jointly undertaken criminal activity, relevant conduct includes, inter alia, reasonably foreseeable acts and omission of others within scope of and in furtherance of jointly undertaken criminal activity occurring during commission of offense of conviction).

The District Court also purportedly committed procedural error when it refused to apply the appropriate downward adjustment under U.S.S.G. § 3B1.2 on account of Mykhaylo's allegedly mitigated role in the offense. But he acknowledges that "'a defendant may receive an adjustment under the guideline if he or she is substantially less culpable than the average participant in the criminal activity.'" (Mykhaylo's Brief at 69 (quoting U.S.S.G. § 3B1.2 cmt. n.3(C)) (emphasis omitted)).) The District Court neither misinterpreted the Guidelines nor committed a clear error when it found that Mykhaylo was not substantially less culpable than his brothers.

According to Mykhaylo, the sentence was substantively unreasonable because no reasonable court would have sentenced him to 240 months in prison (a sentence at the statutory maximum where the calculated Guidelines range was 151 to 188 months) and this sentence was greater than necessary to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553. As the government succinctly explains, "the evidence established that [Mykhaylo] was a knowing and voluntary member of the criminal enterprise who"—recruited workers in Ukraine under false pretenses, obtained visas and passports for them, smuggled the workers into the United States, eventually traveled to this country to manage his own crew of workers, and observed and participated in

beatings and other criminal conduct to keep the workers in line and secure their continued labor as part of the scheme.  (Appellee's Brief at 117.)  In such circumstances, the District Court did not commit reversible error by sentencing Mykhaylo to the statutory maximum.

III.

For the foregoing reasons, we will affirm the judgments of the District Court.